**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and MCMILLIAN, J.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**March 16, 2015**

# In the Court of Appeals of Georgia

A14A2103. THORNTON v. THE STATE.

MᴄMɪʟʟɪᴀɴ, Judge.

Appellant Patti Thornton (hereinafter "appellant")[1] was charged with murder, conspiracy to commit murder, making false statements, and tampering with evidence; her co-defendant, Walter Booth, was charged with murder, conspiracy to commit murder, and making false statements. A jury found appellant not guilty of murder but guilty of the remaining charges, and the same jury acquitted Booth of murder and conspiracy to commit murder but found him guilty of making false statements. Appellant now appeals from the denial of her motion for new trial, arguing that the trial court should have vacated her conviction for conspiracy because the jury's

---

[1] Although generally we do not refer to the parties as the appellant or appellee or to the parties or witnesses by their first names, we find it clearer to do so in this case when many of the persons involved share the same surname.

verdict finding her guilty is inconsistent with its verdict acquitting Booth, her only alleged co-conspirator; the evidence is insufficient to support her convictions for conspiracy and tampering with evidence; and her trial counsel was ineffective. As more fully set forth below, we find no basis for reversal and affirm.

Construed to support the jury's verdict,[2] the evidence shows that sometime in the spring or summer of 2007, appellant, who was married to the victim, Richard ("Shell") Thornton III, began having an illicit relationship with her co-worker Booth, who was also married.[3] Witnesses testified that Booth was protective and jealous of appellant at work, made statements that Shell mistreated appellant, and told co-workers that he would kill anyone who "mess[ed] with" appellant. On one occasion, appellant asked a co-worker to deliver a note to Booth that said "I love you," and she sent Booth numerous e-mails throughout the summer and into the winter of 2007, expressing her love for Booth and her desire to be with him. Appellant also frequently wrote of her hatred for her husband, his mistreatment of her, and her desperate desire to have him "gone for good" from her life, primarily so that she could spend more

---

[2] *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

[3] During this time, Booth and appellant worked together driving dump trucks for a father-son trucking business.

time with Booth. She regularly entreated Booth to help her "out [of] this hell-hole," said she could not take it anymore and wanted it over with, and in November 2007, reminded Booth that he "promised it would be done before Thanksgiving."

Several weeks later, on the morning of December 14, 2007, a sheriff's deputy who had been summoned to the house by appellant found Shell dead in the bedroom he shared with appellant. Georgia Bureau of Investigation ("GBI") agents were primarily responsible for conducting the investigation into the murder, and appellant and other family members were interviewed on the day of the murder and on several subsequent occasions. Appellant told investigators that her daughter Kristin Eunice called her early that morning and asked appellant to bring Eunice her driver's license at work. Appellant said she woke her two teenage sons, Cole Richard Shelley Thornton ("Cole") and Seth Eunice ("Seth"),[4] so that they could get ready for school and that she also spoke to Shell who asked her to make a bank deposit while she was out. Appellant told investigators she took the money to make the deposit and then left the house to take Eunice her driver's license, make the bank deposit, and run some

---

[4] Cole was appellant's biological son with Shell, and Seth was her biological son with her former husband, who had been deceased for a number of years.

other errands. Appellant said she then stopped at her mother's house, which was located nearby.

Appellant told investigators that she returned home and that when she walked in the door, she immediately noticed a bowl of change had been knocked over and that several guns were lying on the floor. She told police that she started yelling for Shell, but then she noticed that their bedroom door was open, which she said had been closed when she left that morning. Appellant said she became frightened someone was in the house, so she left and went back to her mother's house. She told her mother to call police, but then decided to drive to the home of a sheriff's deputy who lived nearby because she thought he would get to her house faster.[5] The deputy returned with her to the house, where he found Shell lying in the bedroom with several gunshot wounds to the head, at least one of which could have been fatal by itself.

Seth and Cole also testified about the events the morning of December 14, 2007. Cole testified that his mother woke him up early and told him that she needed to take Eunice's license to her at work, so he got up and showered and then woke up his brother. Seth and Cole testified they left the house between 7:10 and 7:30 that

---

[5] Appellant's mother testified and gave a similar version of events.

morning and exited through a door in the carport, which was typically kept unlocked and which they did not lock that morning. They said that when they left, their parents' bedroom door was closed, and they did not see or speak to Shell, whom they assumed was still sleeping. Seth and Cole said that everything appeared to be in its usual location when they left, including the guns and the change container.

Seth and Cole testified that they encountered their grandfather Julian "Dwayne" Thornton[6] about 200 to 300 yards from the house and that they briefly talked to him and then left to go to school. Dwayne testified that after talking to the boys, he took some pipe off a trailer, which he said took about 15 to 30 minutes to accomplish.

Dwayne further testified that after he finished his project, he drove to appellant's house to talk to her. He said he knocked on the door but no one answered, so he pushed the door open and went inside. He testified that he noticed a pile of change on the floor and guns lying on a quilt and that the bedroom door was open, but he could not see if anyone was in the bed, which he said appeared messy. Dwayne said he called out several times but did not get an answer, so he closed the door and

---

[6] The record reflects that Dwayne Thornton is appellant's father.

left the house. Dwayne also testified that he did not hear any gunshots while he was working in the area, but said that he doubted he would have heard them in any event.

A GBI crime scene specialist testified that there was no signs of forced entry into the home and that with the exception of the carport door, all the doors and windows were locked. Investigators found a computer, which had the monitor still turned on, in the back of Shell's truck while they were searching the premises the morning of the crime.[7] The computer was analyzed and appellant's e-mails to Booth were discovered. Appellant was interviewed again and admitted that she and Booth e-mailed each other, but she said they only sent each other jokes. She also denied that Booth and she had a romantic relationship.

Booth was also interviewed, and he also denied having a romantic relationship with appellant and denied being at her house on December 14, 2007. He told officers that he was supposed to go to work that day but he decided not to go.[8] Instead, he said he stopped by a convenience store to buy coffee and then went to another store and played video poker.

---

[7] Appellant told investigators that Shell put the computer in his truck the evening before and that he intended to take the computer to be repaired.

[8] Testimony was presented that Booth told his boss and co-workers that he had a doctor's appointment that day and would not be at work.

6

However, Booth's explanation of his whereabouts did not check out, and police also discovered that he and appellant had made numerous telephone calls to each other the morning of Shell's death. Booth told police that he had called appellant to see if she was going to work that day, but could not explain why there was so many calls between them. Booth also told the investigators that he never talked to appellant on the phone unless it was about work and that he had never communicated with her by computer over the internet.

Investigators also learned that a neighbor saw a big truck with "dual" wheels[9] drive slowly down the road toward appellant's house in the early morning hours on the day of the murder. Another neighbor told investigators that he had driven by the house that morning and that he had noticed fresh tire tracks from a big truck in the area. Several of Booth's co-workers also testified that they had seen Booth with a handgun in the months preceding the crime, and one witness testified that a photograph of a gun police showed him looked similar to the one Booth had in his possession two to three weeks before Shell was killed.

---

[9] The witness said that because it was still dark outside, he could not be sure if the truck he saw was a dump truck.

Booth's house was searched during the course of the investigation, and police seized two bottles of Trazodone, which is a prescription anti-depressant that also is sometimes used as a sleep aid, one of which was found in Booth's bedroom.[10] Shell's blood was tested for a variety of substances, and one of those tests revealed that Shell had a therapeutic amount of Trazodone in his blood at the time of his death. Shell's father testified that appellant told him that Shell had taken one of his mother's sleeping pills the night before he was killed, but he said he could not identify the name of the sleeping pill that Shell supposedly took that night, and Shell's physician testified that he had never prescribed Trazodone to Shell.

Other evidence will be set out below as necessary to address appellant's specific contentions on appeal.

1. In her first enumeration of error, appellant contends that the trial court should have vacated her conviction for conspiracy because the same jury acquitted her only alleged co-conspirator and therefore she has in essence been convicted of conspiring with herself, which is an impossibility under Georgia law. We disagree.

---

[10] Booth's wife testified that the medication was legally prescribed to relatives who lived with them.

OCGA § 16-4-8 provides: "A person commits the offense of conspiracy to commit a crime when he together with one or more persons conspires to commit any crime and any one or more of such persons does an overt act to effect the object of the conspiracy." In *Smith v. State*, 250 Ga. 264 (297 SE2d 273) (1982), our Supreme Court recognized that in a joint trial of two alleged conspirators, a verdict of acquittal for one conspirator and conviction of the other "are inconsistent because they reach different results regarding the existence of a conspiracy between these two parties based on exactly the same evidence." Id. at 264. See also *Hubbard v. State*, 274 Ga. App. 639 (618 SE2d 690) (2005).[11]

But the inquiry does not end here. Rather, the key question is whether this inconsistency in the verdicts required appellant to be acquitted of the conspiracy charge. This question has been answered in *Milam v. State*, 255 Ga. 560 (341 SE2d 216) (1986), which was rendered after *Smith*. In *Milam*, our Supreme Court abolished the inconsistent verdict rule in criminal cases and held that a defendant may not attack a conviction because it is inconsistent with the jury's verdict of acquittal on another charge. In so doing, the Court adopted the rationale enunciated by the United States

---

[11] We note that although *Smith* and *Hubbard* set out this general rule, in both of those cases the verdicts at issue were rendered by different juries at separate trials and therefore the general rule was not applied.

Supreme Court in *United States v. Powell*, 469 U.S. 57 (105 SCt 471, 83 LE2d 461) (1984) and *Dunn v. United States*, 284 U.S. 390, 393-394 (52 SCt 189, 76 LE 356) (1932). See also *Standefer v. United State*s, 447 U.S. 10 (100 SCt 1999, 64 LE2d 689) (1980) (rejecting argument that a defendant could not be convicted of aiding and abetting a principal when the alleged actual perpetrator of offense had previously been acquitted of the underlying charge).

As *Powell* explained, "where truly inconsistent verdicts have been reached, the most that can be said is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they there were not convinced of the defendant's guilt." *Powell*, 469 U.S. at 64-65 (quoting *Dunn*, 284 U.S. at 393) (punctuation omitted). The Court went on to give several reasons why jury verdicts should be insulated from attacks based on inconsistency, including that seemingly irreconcilable verdicts should not necessarily be interpreted as a windfall to the government since it is impossible to know whether the verdict was the result of mistake, compromise, or lenity and the government's general inability to seek correction or review of the verdict. Id. at 65.

Our appellate courts have consistently applied *Milam*'s inconsistent verdict rule and adopted the federal court's rationale, explaining that

10

appellate courts cannot know and should not speculate why a jury acquitted on one offense and convicted on another offense. The reason could be an error by the jury in its consideration or it could be mistake, compromise, or lenity. Stated another way, it is imprudent and unworkable to allow criminal defendants to challenge inconsistent verdicts on the ground that in their case the verdict was not the product of lenity, but of some error that worked against them. Such an individualized assessment of the reason for the inconsistency would be based on either pure speculation, or would require inquiries into the jury's deliberations that the courts generally will not undertake.

(Citations and punctuation omitted.) *Turner v. State*, 283 Ga. 17, 20 (2) (655 SE2d 589) (2008). E.g., *Dumas v. State*, 266 Ga. 797, 799 (2) (471 SE2d 508) (1996); *Smashum v. State*, 261 Ga. 248 (2) (403 SE2d 797) (1991); *Artis v. State*, 299 Ga. App. 287, 293 (5) (682 SE2d 375) (2009).

Although the Georgia appellate courts have not applied the inconsistent verdict rule in this context – where in a joint trial, only one conspirator is convicted – the rationale underlying *Milam, Powell*, *Dunn*, and other cases in which we have refused to review or reverse inconsistent or irreconcilable verdicts applies equally in this case. Accordingly, the trial court did not err by refusing to vacate appellant's conviction for conspiracy to commit murder on the basis that such verdict was inconsistent or irreconcilable with the acquittal of appellant's alleged co-conspirator. Accord *United*

11

*States v. Andrews*, 850 F2d 1557, 1561 (11th Cir. 1988) (overruling prior precedent to uphold guilty verdict against a lone conspirator); *United States v. Church*, 955 F2d 688, 695 (2) (B) (1) (11th Cir. 1992) (following *Andrews* and holding that "[i]nconsistent verdicts on a conspiracy count . . . do not defeat the propriety of a defendant's conviction, even if every defendant but one is acquitted"); *United States v. Valles-Valencia*, 823 F2d 381 (9th Cir. 1987) (finding irrelevant "that the conflict in this case involves charges against different defendants, rather than different charges against the same defendant"); *United States v. Hughes Aircraft Co.*, 20 F3d 974, 978 (9th Cir. 1994) (following *Valles-Valencia* and finding that "the conviction of one co-conspirator is valid even when all the other co-conspirators are acquitted"); *United States v. Collins*, 412 F3d 515 (4th Cir. 2005) (declining to reverse appellant's conviction because his co-conspirator was acquitted).

2. Appellant also challenges the sufficiency of the evidence to support her conviction for conspiracy and, in a separate enumeration, contends that the trial court should have granted her motion for directed verdict on that charge. We consider these contentions together since they invoke the same standard of review. E.g., *Hargrove v. State*, 289 Ga. App. 363 (657 SE2d 282) (2008) (standard of review of denial of motion for directed verdict is the same as that used to assess the sufficiency of the

12

evidence); *Sexton v. State*, 269 Ga. App. 709 (605 SE2d 103) (2004). Thus, in deciding this issue, we view the evidence in the light most favorable to the jury's verdict. The accused is no longer entitled to a presumption of innocence, and we do not weigh the evidence or determine witness credibility but only determine if the evidence was sufficient for a rational trier of fact to find the defendant guilty of the charged offense beyond a reasonable doubt. Id. at 709-710.

The State must show both an agreement and an act in furtherance of the agreement to prove the existence of a conspiracy. *McCright v. State*, 176 Ga. App. 486 (336 SE2d 361) (1985); OCGA § 16-4-8. However, it is not necessary for the State to prove an express agreement; rather "[t]he state need only prove that two or more persons tacitly came to a mutual understanding to accomplish or to pursue a criminal objective." *Duffy v. State*, 262 Ga. 249, 250 (1) (416 SE2d 734) (1992). Further "[t]his tacit understanding may be proved by circumstantial evidence, inferred from the nature of the acts done, the relation of the parties, the interest of the alleged conspirators, and other circumstances." (Citation and punctuation omitted.) *Aguilera v. State*, 293 Ga. App. 523, 526 (2) (667 SE2d 378) (2008).

Among other things, the evidence in this case shows that appellant sent Booth numerous e-mails over the course of several months entreating him to help her out of

13

what she described as the "hell" she was living in, that she made specific references to shooting and killing the victim, and that, just several weeks before the victim was shot, she reminded Booth of his promise that "it" would be done by a certain date. Additionally, she sent Booth another e-mail just days before the murder, urging Booth to "[r]emember I have to get rid of this computer 'cause everything can be pulled off it . . . and that would not be good,'" and a computer from the house appeared to have been hastily thrown in the back of Shell's truck on the day of the murder.

Additionally, the evidence showed that Booth had easy access to the sedative-like-drug Trazodone and that Shell had a therapeutic amount of Trazodone in his blood when he died, although his doctor testified he never prescribed Shell that medication. Appellant made sure her sons were out of the house early that morning and then she left the house and went to several places where her presence could be verified before returning to the house where Shell had been shot. Booth and appellant exchanged numerous, unexplained telephone calls the morning of the murder, and both Booth and appellant lied to police about the nature of their relationship. "Circumstances supporting an inference of conspiracy include presence, companionship and conduct before and after the commission of the alleged offenses. . . ." (Citation and punctuation omitted.) *Aguilera*, 293 Ga. App. at 526 (2). This and

14

other evidence presented at trial was sufficient to prove beyond a reasonable doubt that appellant conspired to murder her husband. *Duffy v. State*, 262 Ga. at 250 (1); *Sexton*, 269 Ga. App. at 711 (1). Accordingly, appellant is not entitled to reversal of her conviction on this basis.

3. Thornton also challenges the sufficiency of the evidence to convict her of tampering with evidence and contends the trial court should have granted her motion for directed verdict on that charge.

Under OCGA § 16-10-94 (a), "[a] person commits the offense of tampering with evidence when, with the intent to prevent the apprehension . . . of any person or to obstruct the prosecution . . . of any person, he knowingly destroys, alters, conceals, or disguises physical evidence. . . ." Shell's father testified that one of appellant's sons told him that after investigators had allowed them to return to the house, appellant found a bullet shell casing on the floor in the bedroom where Shell had been shot and that when her son suggested she might need to keep it, she supposedly made remarks indicating she needed to dispose of the casing because it had her fingerprints on it. Several weeks after the murder, investigators conducted a trash pull at the residence and found the spent casing inside a soft drink can that had been cut in half. This evidence belies appellant's contention that she did not realize the importance of

15

the evidence, and appellant's conviction of tampering with evidence is also affirmed. *White v. State*, 287 Ga. 713 (699 SE2d 291) (2010).

4. Appellant also contends that her trial counsel was ineffective because he failed to challenge her conviction for conspiracy on the basis that it was inconsistent with the jury's verdict acquitting her co-conspirator. However, for the reasons set forth in Division 1, such a challenge would have been unavailing, and the failure to make such a futile or meritless motion will not constitute ineffective assistance of counsel. E.g., *Hargrove v. State*, 291 Ga. 879, 883 (2) (b) (734 SE2d 34) (2012); *Jimmerson v. State*, 289 Ga. 364, 369 (2) (d) (711 SE2d 660) (2011).

*Judgment affirmed. Phipps, C. J., and Ellington, P. J., concur.*