**FIFTH DIVISION**
**ELLINGTON, P. J.,**
**ANDREWS and BETHEL, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**December 20, 2017**

# In the Court of Appeals of Georgia

A17A1619. TAYLOR v. THE STATE.

BETHEL, Judge.

Anthony Bernard Taylor appeals from the denial of his motion for a new trial after a jury convicted him of conspiracy to commit burglary, two counts of burglary in the first degree, criminal damage to property in the first degree, battery, two counts of home invasion in the first degree, armed robbery, aggravated assault, aggravated assault with intent to rob, kidnapping, false imprisonment, and four counts of possession of a weapon during the commission of a crime. . On appeal, Taylor argues that the evidence presented by the State on a number of the charges was insufficient to support a verdict of guilt beyond reasonable doubt. Taylor also argues that the verdict rendered by the jury was decidedly and strongly against the weight of the evidence and that the trial judge erred by not granting him a new trial on this basis.

Taylor argues that the evidence in the case was thus sufficiently close so as to warrant the trial court's exercise of its so-called "thirteenth juror" power pursuant to OCGA §§ 5-5-20 and 5-5-21, and that the trial court erred by not granting him a new trial on that basis. Finally, Taylor argues that the trial court erred by providing an erroneous definition of the offense of possession of a weapon during a crime in its charge to the jury. Because we find each of these enumerations to be without merit, we affirm.

On appeal, the defendant "is no longer presumed innocent and all of the evidence is to be viewed in the light most favorable to the jury verdict." *Batten v. State*, 295 Ga. 442, 443 (1) (761 SE2d 70) (2014) (citation omitted). So viewed, the evidence shows that, on October 8, 2014, Clayton County police responded to a 9-1-1 call placed from an apartment complex in College Park. Upon arrival, at about 10:30 pm, the responding officer was met by the victim at the door of her apartment unit. Upon entering the apartment, the officer noted that it appeared to have been "rummaged through" and that things were tossed around, out of place, and out of order.

Earlier in the evening, Taylor and three accomplices had driven to the apartment complex in a white Nissan Altima. One of the accomplices, the only

female[1] in the group, walked to the apartment unit rented by the victim and knocked on the door, receiving no response from inside.

At the time, the victim was in the apartment alone. She heard the knock at the door just after she had finished taking a shower. After a second knock at the door, the victim looked through the peephole in her door and saw a woman standing at the door who she did not recognize. The victim ignored the knock on the door and turned to go back to her bedroom. As she turned away from the door, her front door was rammed open, striking her on the head and causing swelling to her forehead. Immediately, three men ran through the doorway. Upon entering the apartment, the men began screaming at the victim and demanding money while one of the men pointed a handgun at her face.

While one of the men held the victim at gunpoint at the door of the apartment, the other two men began running through the apartment, again demanding money. After closing the door to her apartment, the men demanded that the victim disarm her security alarm, which had begun going off. After she complied, they dragged her at gunpoint to the bathroom in the back of the apartment, pushed her to the floor, and closed the door. Minutes later, the men returned to the bathroom and dragged the

---

[1] The female accomplice testified that she regularly referred to Taylor as "Ant."

victim at gunpoint into the closet of her bedroom, shutting the door behind them. Later, they opened the closet, pulled the victim from it, and threw her onto her bed. They proceeded to ransack her closet, again demanding money. When the victim told them she had no money, they found a trash bag and began throwing numerous items in the room into it, Additionally, they dumped the contents of a jewelry box into the bag and took clothes, shoes, and other items that were visible in the closet. The victim testified that she was held at gunpoint while all of these items were taken.

As they continued ransacking her room, the largest of the men began speaking to one of the other men, referring to him as "Ant." The victim stated that the man referred to as "Ant" had been the one who held the gun directly in her face after the men first came in the apartment and the one who ordered her into the bathroom. The victim stated that "Ant" told her that if she called the police that he would come back and kill her. "Ant" also told the victim to "tell your boyfriend to stop playing, I know he has money in here, stop playing."

The victim testified that, as the men began to leave the apartment, "Ant" picked up the victim's television and carried it out of the apartment along with the victim's laptop computer and laptop bag. In addition to those items, upon inspection, the victim later learned (and later reported to the police) that the men had taken her cell

phone, purse, credit cards, work bag, a Pittsburgh Pirates baseball cap, a Playstation 3, jewelry, watches, and clothing.[2]

After the men left her apartment, the victim saw a white compact sedan parked outside. The female accomplice, who was seated in the driver seat of the car, later testified that the men returned to the car carrying a television and some shoes. She testified that one of the men had a gun tucked onto his pants when he returned to the car. After the men placed the items they had taken from the victim's apartment in the car, the female accomplice drove the car away from the apartment complex.

The victim called 9-1-1 from her neighbor's apartment across the hall. She provided descriptions of the men and the white vehicle to the responding officer and also indicated that one of the men had been referred to as "Ant." In a later report to the police, she estimated that the total value of the items that were stolen was over $20,000.

Another witness who knew Taylor through a mutual acquaintance testified at trial that Taylor regularly drove a white compact sedan. That witness identified Taylor in a photo lineup and in court. Taylor's former girlfriend also testified at trial

---

[2] The victim's neighbor from across the hall testified that, through her peephole, she saw men emerging from the victim's apartment with a television and a bag that appeared to have belts and shoes in it.

and stated that she and Taylor shared a white 2010 Nissan Altima. When asked if she recognized the vehicle in a photograph taken from a security camera at the scene of the incident, she responded, "It looks like mine." She recalled that Taylor was driving the car the day of the incident. Security videos at the apartment captured footage of a white car entering and leaving the apartment complex around the time of the incident. One of the camera angles captured the vehicle's license plate number. The vehicle was found to be registered to Taylor's girlfriend.

The victim spoke with police several times after this incident and participated in several line-up identifications. In her trial testimony, she indicated that she identified Taylor in one of the lineups. She indicated that Taylor was the person who held the gun in her face during the incident.

Another witness stated that, on the night of the incident, Taylor gave him a credit card number (that belonged to neither Taylor or the witness) so that the witness could pay a cell phone bill. That witness testified at trial that he had heard Taylor referred to as "Ant," and the witness referred to Taylor as "Ant" in his testimony.

Another witness, whose boyfriend is Taylor's cousin, testified that she had previously heard Taylor referred to as "Ant." That witness testified about text messages she received from Taylor the day after the incident which contained a long

6

series of digits, an expiration date, and a code. A subsequent message, sent from the witness to Taylor, stated, "It's not saying decline, it's saying incorrect card info." The witness testified that she understood the message from Taylor to contain a credit card number, with its accompanying expiration date and security code and that the card associated with those numbers did not belong to her.

Taylor's former girlfriend testified that, the day following the incident, she saw Taylor in his apartment with what appeared to be credit cards. She stated that she had never seen those particular cards before.

The victim told police investigators that she had several fraudulent charges on the credit cards that were stolen. For one of the fraudulent charges, the email account "ataylor810@yahoo.com" was listed in the order. That order was placed on October 9, 2014, the day after the incident. For each of the fraudulent charges that resulted in goods being shipped, the goods were all sent to the same address. Tracking this address prompted the police to construct the photo lineup that was presented to the victim in which she identified Taylor. When the police searched Taylor's apartment, they found belts, a Pirates baseball hat, Playstation games, ID cards belonging to the victim and her boyfriend, and a store receipt with the victim's boyfriend's name on it in Taylor's bedroom.

Taylor was arrested and participated in a series of interrogations while in police custody. In one of those interviews, Taylor admitted to the police that he had been involved in the invasion of the victim's home, that he was present in her home on the date of the incident, that he entered her home, that he had a gun, that he entered with intent to burglarize the home, and that he stole numerous items from the victim. Taylor admitted to police that he used the email address "ataylor810@yahoo.com". He also told the questioning officer that he did not expect anyone to be home when he went to the victim's apartment but that he and the other men went ahead with their plans once they discovered the victim was home.

Taylor was later indicted on numerous counts stemming from this incident. Following his conviction, Taylor filed a motion for a new trial, asserting the same grounds enumerated as error here. The trial court denied that motion, and this appeal followed.

1. Taylor first contends that the evidence presented by the State was insufficient to support several of the counts for which he was convicted. For each of the offenses for which Taylor was convicted, he claims that the State failed to establish his role in the commission of the offenses. We disagree.

8

In addition to the victim's identification of Taylor through a photo lineup and an in-court identification, several other witnesses testified that they knew Taylor by the nickname "Ant," a name he was referred to as by one of his accomplices during the incident. Because the victim's testimony speaks directly to conduct by Taylor during the incident (namely holding her at gunpoint, dragging her through the apartment, making various demands of her, and taking items from the apartment), the evidence presented at trial established both Taylor's identity and specific acts he took to effectuate the various crimes for which he was convicted. He also admitted to participating in the incident when he was questioned by police. Because the State established Taylor's identity through this evidence, the jury was authorized to determine the credibility of the witnesses and other evidence identifying him as well as what weight should be given to those identifications. *See Graham v. State*, 337 Ga. App. 193, 195 (1) (786 SE2d 857) (2016).

The evidence presented was thus sufficient to satisfy the State's threshold burden of establishing Taylor's identity. We now consider the sufficiency of the evidence presented by the State for each count challenged by Taylor.[3]

_____

[3]Although Taylor was convicted of two counts of home invasion in the first degree, his brief omits any discussion regarding the sufficiency of the evidence presented by State in regard to those charges. We therefore have not considered the

9

(a) Taylor first challenges the sufficiency of the evidence presented by the State in regard to his convictions for burglary in the first degree and conspiracy to commit burglary. OCGA § 16-7-1 (b) provides in part that "[a] person commits the offense of burglary in the first degree when, without authority and with the intent to commit a felony or theft therein, he or she enters or remains within an occupied . . . dwelling house of another or any building . . . or other such structure designed for use as the dwelling of another." OCGA § 16-4-8 provides that "[a] person commits the offense of conspiracy to commit a crime when he together with one or more persons conspires to commit any crime and any one or more of such persons does any overt act to effect the object of the conspiracy."

In this case, the evidence established each element of the burglary offense. The apartment where the robbery took place was not owned or leased by Taylor, and he and his accomplices did not obtain the victim's consent to enter. *See Davis v. State*, 326 Ga. App. 778, 778-80 (1) (757 SE2d 443) (2014) (evidence sufficient to support burglary conviction where State established that defendant entered victim's apartment without her consent). Taylor confessed to police that he had entered the apartment

sufficiency of the evidence presented by the State on those charges and deem any challenge to such evidence abandoned pursuant to Court of Appeals Rule 25 (c) (2).

and had done so with intent to burglarize it. The apartment was occupied by the victim at the time, and the evidence established that Taylor and his accomplices took a number of items from the apartment.

The evidence also satisfied each of the elements of conspiracy to commit the burglary. "The State must show both an agreement and an act in furtherance of the agreement to prove the existence of a conspiracy." *Thornton v. State*, 331 Ga. App. 191, 197 (2) (770 SE2d 279) (2015) (citation omitted). The State did not present direct evidence of a specific agreement between Taylor and his three accomplices to burglarize the apartment.

> However, it is not necessary for the State to prove an express agreement; rather the State need only prove that two or more persons tacitly came to a mutual understanding to accomplish or to pursue a criminal objective. Further this tacit understanding may be proved by circumstantial evidence, inferred from the nature of the acts done, the relation of the parties, the interest of the alleged conspirators, and other circumstances.

*Id*. at 197 (2) (citations and punctuation omitted).

Here, evidence established that Taylor acted in concert with three others to effectuate the burglary, including arranging for the female accomplice to drive the group to and from the apartment complex and making joint efforts to enter, ransack,

11

and steal several items from the victim's apartment. The evidence was thus sufficient for the jury to infer a conspiracy between Taylor and his accomplices.

(b) Taylor next challenges the sufficiency of the evidence presented by the State on his conviction for criminal damage to property in the first degree. OCGA § 16-7-22 (a) provides, in relevant part, that "[a] person commits the offense of criminal damage to property in the first degree when he . . . [k]nowingly and without authority interferes with any property in a manner so as to endanger human life[.]"

In this case, the indictment alleged that Taylor committed this offense by kicking in the front door of the victim's apartment in a manner so as to endanger her life by causing violent contact with her. The evidence presented by the State established that the door was violently forced open by Taylor and his accomplices and that it struck the victim, immediately causing her head to swell.

As this Court held in *Carter v. State*, 212 Ga. App. 139, 139 (441 SE2d 100) (1994), this offense need not necessarily injure the owner of the damaged property and can apply where the person who is endangered is an apartment tenant. As *Carter* notes, "[c]riminal damage to property in the first degree is a crime against *the State* involving the unauthorized interference with property in a manner that endangers human life." *Carter*, 212 Ga. App. at 139 (emphasis in original).

Our Supreme Court has construed the phrase "in a manner so as to endanger human life" to mean "reckless endangerment rather than actual endangerment." *See Carthern v. State*, 272 Ga. 378, 381 (529 SE2d 617) (2000). The largest share of cases construing OCGA § 16-7-22 (a)'s endangerment requirement have involved the firing of guns or similar acts which result in some type of projectile entering or being directed at a dwelling or motor vehicle.[4] A number of other cases involved defendants who set fire to buildings or objects within a building or who took steps to do so.[5]

[4] *See, e.g., Carthern v. State*, 272 Ga. 378, 381 (529 SE2d 617) (2000) (elements of OCGA § 16-7-22 (a) satisfied where defendant fired gun into apartment where people were likely to be present); *Waugh v. State*, 263 Ga. 692, 693 (2) (437 SE2d 297) (1993) (evidence sufficient where defendant threw large rock from a bridge into oncoming traffic); *Craft v. State*, 309 Ga. App. 698, 702 (3) (710 SE2d 891) (2011) (evidence sufficient where defendant fired gun at an inhabited apartment building); *Robinson v. State*, 217 Ga. App. 832, 833-34 (2) (459 SE2d 588) (1995) (evidence sufficient where defendant fired gun at vehicle and bullet struck rear tire of the vehicle which was occupied by victim at the time). *Cf. In re M.D.L.*, 271 Ga. App. 738, 741 (1) (c) (610 SE2d 687) (2005) (evidence insufficient where defendant fired gun into unoccupied automobile at 4:00 am and vehicle was not positioned in such a way that there was a risk bullets would enter nearby residence).

[5] *See, e.g., Williams v. State*, 329 Ga. App. 706, 710-11 (1) (c) (766 SE2d 474) (2014) (evidence of danger to human life established due to severity of fire set by defendant and its proximity to residences, business, and a gas station); *Gooch v. State*, 289 Ga. App. 74, 75 (1) (656 SE2d 214) (2007) (evidence sufficient where defendant threw burning bed sheet onto victim's bedroom floor); *Robinson v. State*, 288 Ga. App. 219, 221-22 (2) (653 SE2d 810) (2007) (evidence sufficient where defendant threatened to burn down restaurant and poured gasoline onto restaurant's tables and carpet). *Cf. Loethen v. State*, 158 Ga. App. 469, 471 (2) (280 SE2d 878) (1981)

13

However, this statute's reach is not limited to the narrow circumstances addressed by our existing case law, as it proscribes any conduct which simultaneously damages property of another while creating a risk to human life.

Here, a rational trier of fact was authorized to find that the collective act of Taylor and his accomplices, all adult men, of breaking down the door to the victim's apartment was taken without regard to any harm that such an act could cause to anyone in the path of the door. Moreover, the jury was authorized to find that the door was broken down with a measure of force sufficient that the life of anyone struck by the door could have been jeopardized.[6] There was thus sufficient evidence to support Taylor's conviction for criminal damage to property in the first degree.

(c) Taylor next challenges the sufficiency of the evidence presented by the State on his conviction for battery. OCGA § 16-5-23.1 (a) provides that "[a] person

---

(evidence insufficient under former OCGA 26-1501 (a) where defendant prisoner set fire to mattress made of non-flammable material in a cell that only he occupied).

[6] In affirming Taylor's conviction on the facts before us, we note that not all incidents involving the breaking of a door will support a conviction for criminal damage to property in the first degree. However, because in this case the jury heard the testimony of the victim who was struck by the door and was able to see in the courtroom each of the men who were alleged to have rammed open the door, the jury, as trier of fact, could determine whether the force applied by the three defendants was sufficient to present a risk of death to anyone struck by the door.

commits the offense of battery when he or she intentionally causes . . . visible bodily harm to another." OCGA § 16-5-23.1 (b) goes on to provide that "[a]s used in this Code section, the term 'visible bodily harm' means bodily harm capable of being perceived by a person other than the victim and may include, but is not limited to, substantially blackened eyes, substantially swollen lips or other facial or body parts, or substantial bruises to body parts."

In this case, the indictment alleged, and the evidence established, that Taylor and his accomplices committed this act by kicking down the door to the victim's apartment and causing injury to her head. The evidence established that the victim suffered swelling on her head as the result of that contact. The evidence was therefore sufficient to establish each element of battery.

(d) Taylor next challenges the sufficiency of the evidence presented by the State on his conviction for armed robbery. OCGA § 16-8-41 (a) provides that "[a] person commits the offense of armed robbery when, with intent to commit theft, he or she takes property of another from the person or the immediate presence of another by use of an offensive weapon[.]"

Here, while in police custody, Taylor admitted to entering the victim's apartment with intent to burglarize the apartment. While inside, Taylor and his

15

accomplices made repeated demands for money from the victim. The evidence also established that numerous articles of property owned by the victim and her boyfriend were taken from the apartment, including a television, credit cards, clothing, jewelry, and other items, many of which were recovered from Taylor's residence by the police. Taylor also admitted to police that he had stolen items from the apartment. Moreover, the evidence established that Taylor was in possession of a handgun and that he held the victim at gun point while the robbery of the victim's apartment was effectuated. The evidence was thus sufficient to support Taylor's conviction for armed robbery.

(e) Taylor next challenges the sufficiency of the evidence presented by the State on his convictions for aggravated assault and aggravated assault with intent to rob. OCGA § 16-5-21 (a) (1) provides that "[a] person commits the offense of aggravated assault when he or she assaults . . . [w]ith intent to . . . rob . . . [w]ith a deadly weapon[.]" OCGA § 16-5-20 (a) provides that a person commits the offense of assault "when he or she . . . [c]ommits an act which places another in reasonable apprehension of immediately receiving a violent injury."

In this case, the evidence establishes that Taylor utilized a firearm, a deadly weapon, to hold the victim in place while he and others effectuated a robbery of her apartment. The jury was authorized to find that the act of holding her at gunpoint

16

placed her in reasonable apprehension of immediately receiving a violent injury and that the act was done with the intent to rob the victim. The evidence thus established each of the elements of the offense of aggravated assault. *See Ford-Calhoun v. State*, 327 Ga. App. 835, 836 (1) (a) (i) (761 SE2d 388) (2014) (evidence sufficient to support conviction for aggravated assault where defendant pointed gun at victim while demanding money).

(f) Taylor next challenges the sufficiency of the evidence presented by the State on his conviction for false imprisonment. OCGA § 16-5-41 (a) provides that "[a] person commits the offense of false imprisonment when, in violation of the personal liberty of another, he arrests, confines, or detains such person without legal authority." This Court has recently expressed its understanding of the word "confine" to mean "holding one within a location or keeping one within certain limits." *See Moore v. State*, 340 Ga. App. 151, 154 (2) n.2 (796 SE2d 754) (2017) (citation omitted). Here, the evidence was sufficient to support Taylor's conviction for this offense, as he held the victim at gun point in various places inside the apartment and did not permit her to leave. "To sustain a conviction for false imprisonment, the State must show evidence of an arrest, confinement, or detention, and detention for a brief amount of time is sufficient. It is for the jury to decide if the detention amounted to

17

false imprisonment." *Id*. at 154 (citations and punctuation omitted). As the State satisfied the burden of establishing confinement of the victim by Taylor and his accomplices, there was sufficient evidence to support his conviction for this offense.

(g) Taylor next challenges the sufficiency of the evidence presented by the State on his conviction for kidnapping. OCGA § 16-5-40 (a) provides that "[a] person commits the offense of kidnapping when such person abducts or steals away another person without lawful authority or warrant and holds such other person against his or her will." This Court has explained that "[t]he only difference between kidnapping and false imprisonment is the element of asportation." *Curtis v. State*, 310 Ga. App. 782, 787 (2) (714 SE2d 666) (2011). With regard to asportation, OCGA § 16-5-40 (b) provides that

> [S]light movement shall be sufficient; provided, however, that any such slight movement of another person which occurs while in the commission of any other offense shall not constitute the offense of kidnapping if such movement is merely incidental to such other offense . . . Movement shall not be considered merely incidental to another offense if it . . . [c]onceals or isolates the victim . . . [m]akes the commission of the other offense substantially easier . . . [l]essens the risk of detection; or [i]s for the purpose of avoiding apprehension.

18

In this case, the evidence established that Taylor first held the victim at gun point near the front door of her apartment. As Taylor's accomplices ransacked the apartment, the victim was moved from the front doorway to the bathroom and later to the bedroom, each time at gunpoint. After moving her from the doorway and forcing her to disable her security alarm, one of the perpetrators propped the front door back into place.

By moving the victim away from the doorway and into interior rooms of the apartment, Taylor and his accomplices concealed and isolated her from anyone that would have happened by the door to the apartment at the time. Such movement, along with forcing her to disable the security alarm, also reduced the likelihood that their acts would be detected while they continued to ransack the apartment. The act of moving the victim also aided in the ongoing robbery of the victim's apartment, as the perpetrators could remain together and more easily communicate and coordinate their efforts from the same room of the apartment while asking the victim about the location of money and other items. Thus, because the evidence established that the victim was moved and that such movement was not merely incidental, the evidence was sufficient to support Taylor's conviction for kidnapping. *See White v. State*, 332 Ga. App. 495, 498-99 (2) (c) (773 SE2d 448) (2015) (evidence sufficient where jury

19

could infer that movement of victim to a different room in the house was for purpose of isolating victim); *cf. Gonzales v. Hart*, 297 Ga. 670, 673-74 (777 SE2d 456) (2015) (evidence insufficient to support kidnapping conviction where defendant grabbed victim by hair and threw her against bedroom wall during domestic dispute, as act was inseparable from act of family violence battery committed by defendant).

(h) Taylor next challenges the sufficiency of the evidence presented by the State on each of his four convictions for possession of a weapon during the commission of a crime. OCGA § 16-11-106 (b) provides, in relevant part, that "[a]ny person who shall have on or within arm's reach of his or her person a firearm or a knife having a blade of three or more inches in length during the commission of, or the attempt to commit . . . [a]ny crime against or involving the person of another . . . [t]he unlawful entry into a building [or a] theft from a building . . . and which crime is a felony, commits a felony[.]" Here, the predicate offenses were armed robbery, aggravated assault, burglary in the first degree, and home invasion.

As noted above, the State presented sufficient evidence to establish that Taylor committed the offenses of armed robbery, aggravated assault, and burglary in the first

degree. He has not challenged the sufficiency of the evidence presented against him on his charge for home invasion. Each of the predicate offenses are felonies.[7]

The testimony of the victim established that Taylor was in possession of a firearm when he entered the victim's apartment, that he remained in possession of that firearm throughout the incident, and that he held her at gunpoint at various locations in the apartment as the incident transpired. The evidence was thus sufficient to establish that Taylor was in possession of the handgun while each of the predicate offenses were committed. *See Hardy v. State*, 293 Ga. App. 265, 266-67 (1) (666 SE2d 730) (2008) (noting that testimony of either the victim or other eyewitnesses alone sufficed to establish defendant's possession of gun during commission of predicate felony); OCGA § 24-14-8 (providing that "[t]he testimony of a single witness is generally sufficient to establish a fact" except in certain situations not implicated here).

---

[7] *See* OCGA § 16-5-21 (b) (providing that penalty for aggravated assault is one to twenty years imprisonment); OCGA § 16-7-1 (b) (providing that first degree burglary is a felony); OCGA § 16-7-5 (d) (providing for felony punishments for home invasion); OCGA 16-8-41 (b) (providing for punishment of armed robbery of ten to twenty years imprisonment); *see also* OCGA § 16-1-3 (5) (defining "felony" as "any crime punishable . . . by imprisonment for more than 12 months.").

2. Taylor next contends that the trial court erred by denying his motion for a new trial because the jury's verdict was decidedly and strongly against the weight of the evidence. Taylor argues that the trial court erred by not exercising its discretion as the "thirteenth juror" and granting him a new trial pursuant to OCGA §§ 5-5-20 and 5-5-21. Even when the evidence is legally sufficient to sustain a conviction, a trial judge may grant a new trial if the verdict of the jury is "contrary to . . . the principles of justice and equity," OCGA § 5-5-20, or if the verdict is "decidedly and strongly against the weight of the evidence." OCGA § 5-5-21. When properly raised in a timely motion, these grounds for a new trial—commonly known as the "general grounds"—require the trial judge to exercise a broad discretion to sit as a "thirteenth juror." *Id*. at 769.

"A trial court reviewing a motion for new trial based on these grounds has a duty to exercise its discretion and weigh the evidence and consider the credibility of the witnesses." *Choisnet v. State*, 292 Ga. 860, 861 (742 SE2d 476) (2013) (citation omitted). If the trial court performs this duty, then we have no basis for reviewing the court's decision, as "such a decision is one that is solely within the discretion of the trial court." *Dixon v. State*, 341 Ga. App. 255, 264 (2) (b) (800 SE2d 11) (2017) (citation omitted). "On appeal from the trial court's denial of a motion for a new trial

22

on the general grounds set forth in OCGA §§ 5-5-20 . . . or 5-5-21 . . . the appellate court has no discretion to grant a new trial on that ground; we can only review the evidence to determine if there is any evidence to support the verdict." *Morrison v. Kicklighter*, 329 Ga. App. 630, 631 (1) (765 SE2d 774) (2014) (citations and punctuation omitted).

As set forth fully in Division 1, *supra*, the evidence presented by the State at trial was sufficient to support each of the convictions challenged by Taylor in this appeal. Moreover, the record reflects that the trial court properly weighed the evidence presented at trial and therefore did not abuse its discretion by denying Taylor's motion for a new trial on these grounds.

3. Finally, Taylor contends that the trial court erred by providing an erroneous definition of the offense of possession of a weapon during a crime when it instructed the jury. We find no error here.

We review the jury instructions at issue in this case for plain error, as Taylor did not object below. *See Henderson v. State*, 333 Ga. App. 759, 760 (1) (777 SE2d 48) (2015) (citing OCGA § 17-8-58 (b) and noting that the failure to object regarding a jury instruction at trial precludes appellate review unless "the jury charge constitutes plain error which affects substantial rights of the parties").

As noted in Division 1 (h), *supra*, OCGA § 16-11-106 (b) provides, in relevant part, that "[a]ny person who shall have on or within arm's reach of his or her person a firearm . . . during the commission of, or the attempt to commit . . . [a]ny crime against or involving the person of another . . . [t]he unlawful entry into a building [or a] theft from a building . . . and which crime is a felony, commits a felony[.]" Each of the four counts in the indictment alleging that Taylor was in possession of a weapon during the commission of a crime alleged that he had within arm's reach of his person a firearm during the commission of the crimes of armed robbery, aggravated assault, burglary in the first degree, and home invasion. The language in those counts of the indictment tracked, without omission, the relevant language of OCGA § 16-11-106 (b).

The trial court's instruction also conformed to the language of the indictment and the evidence presented at trial. In instructing the jury, the trial court stated that "[a] person commits the offense of a possession of a firearm during the commission of a crime, when the person has on or within arms reach of his person, a firearm during the commission of or any attempt to commit a felony, which is any crime against or involving the person of another. The offenses of home invasion, aggravated assault, armed robbery, and burglary are felonies under the laws of this State[.]"

Taylor argues that, by designating this offense as the "possession of a *firearm* during the commission of a felony" rather than as "possession of a *weapon* during the commission of a felony" the trial judge's instruction misstated the law. We disagree.

> In criminal cases, jury instructions must be tailored to fit the allegations in the indictment and the evidence admitted at trial. If a jury charge recites the entire definition of a crime and the indictment does not, there is a reasonable probability that the deviation violated the accused's due process rights by resulting in a conviction of a crime committed in a manner not charged in the indictment.

*Hopkins v. State*, 255 Ga. App. 202, 205 (2) (564 SE2d 805) (2002) (punctuation and footnote omitted). In this case, because neither the indictment nor the evidence presented by the State suggested that Taylor had been in possession of any type of weapon other than a firearm, the trial court's charge was properly tailored to the indictment and the evidence presented. That the judge referred to the offense as "possession of a *firearm*" only reinforced to the jury that the State's theory of the charges was based solely on Taylor's alleged possession of a handgun, as testified to by the victim. Accordingly, we find no error here.

*Judgment affirmed. Ellington, P. J., and Andrews, J., concur*.