In the Supreme Court of Georgia

Decided:    March 21, 2016

S15G1108.  THORNTON v. THE STATE.

BENHAM, Justice.

Appellant Patti Thornton "was charged with murder, conspiracy to commit murder, making false statements, and tampering with evidence; her co-defendant, Walter Booth, was charged with murder, conspiracy to commit murder, and making false statements. A jury found appellant not guilty of murder but guilty of the remaining charges, and the same jury acquitted Booth of murder and conspiracy to commit murder but found him guilty of making false statements." Thornton v. State, 331 Ga. App. 191 (770 SE2d 279) (2015). On appeal, the Court of Appeals affirmed appellant's convictions, relying on cases abolishing the inconsistent verdict rule. See United States v. Powell, 469 U.S. 57 (105 SCt 471, 83 LE2d 461) (1984);  Milam v. State, 255 Ga. 560 (341 SE2d 216) (1986).  We granted appellant's petition for certiorari, posing the following question to the parties: "Did the Court of Appeals err when it affirmed

appellant's conviction for conspiracy to murder although her sole co-conspirator was acquitted of conspiracy to murder by the jury before which they were jointly tried?" Because we answer the question in the negative, the judgment is affirmed.

1. The facts are set forth in Thornton v. State, supra, 331 Ga. App. at 191-194 as follows:

> Construed to support the jury's verdict, the evidence shows that sometime in the spring or summer of 2007, appellant, who was married to the victim, Richard ("Shell") Thornton III, began having an illicit relationship with her co-worker [Walter] Booth, who was also married. Witnesses testified that Booth was protective and jealous of appellant at work, made statements that Shell mistreated appellant, and told co-workers that he would kill anyone who "mess[ed] with" appellant. On one occasion, appellant asked a co-worker to deliver a note to Booth that said "I love you," and she sent Booth numerous e-mails throughout the summer and into the winter of 2007, expressing her love for Booth and her desire to be with him. Appellant also frequently wrote of her hatred for her husband, his mistreatment of her, and her desperate desire to have him "gone for good" from her life, primarily so that she could spend more time with Booth. She regularly entreated Booth to help her "out [of] this hell-hole," said she could not take it anymore and wanted it over with, and in November 2007, reminded Booth that he "promised it would be done before Thanksgiving."
>
> Several weeks later, on the morning of December 14, 2007, a sheriff's deputy who had been summoned to the house by appellant found Shell dead in the bedroom he shared with appellant. Georgia Bureau of Investigation ("GBI") agents were primarily responsible for conducting the investigation into the murder, and

appellant and other family members were interviewed on the day of the murder and on several subsequent occasions. Appellant told investigators that her daughter Kristin Eunice called her early that morning and asked appellant to bring Eunice her driver's license at work. Appellant said she woke her two teenage sons, Cole Richard Shelley Thornton ("Cole") and Seth Eunice ("Seth"), so that they could get ready for school and that she also spoke to Shell who asked her to make a bank deposit while she was out. Appellant told investigators she took the money to make the deposit and then left the house to take Eunice her driver's license, make the bank deposit, and run some other errands. Appellant said she then stopped at her mother's house, which was located nearby.

Appellant told investigators that she returned home and that when she walked in the door, she immediately noticed a bowl of change had been knocked over and that several guns were lying on the floor. She told police that she started yelling for Shell, but then she noticed that their bedroom door was open, which she said had been closed when she left that morning. Appellant said she became frightened someone was in the house, so she left and went back to her mother's house. She told her mother to call police, but then decided to drive to the home of a sheriff's deputy who lived nearby because she thought he would get to her house faster. The deputy returned with her to the house, where he found Shell lying in the bedroom with several gunshot wounds to the head, at least one of which could have been fatal by itself.

Seth and Cole also testified about the events the morning of December 14, 2007. Cole testified that his mother woke him up early and told him that she needed to take Eunice's license to her at work, so he got up and showered and then woke up his brother. Seth and Cole testified they left the house between 7:10 and 7:30 that morning and exited through a door in the carport, which was typically kept unlocked and which they did not lock that morning. They said that when they left, their parents' bedroom door was closed, and they did not see or speak to Shell, whom they assumed was still sleeping. Seth and Cole said that everything appeared to be

3

in its usual location when they left, including the guns and the change container.

Seth and Cole testified that they encountered their grandfather Julian "Dwayne" Thornton about 200 to 300 yards from the house and that they briefly talked to him and then left to go to school. Dwayne testified that after talking to the boys, he took some pipe off a trailer, which he said took about 15 to 30 minutes to accomplish.

Dwayne further testified that after he finished his project, he drove to appellant's house to talk to her. He said he knocked on the door but no one answered, so he pushed the door open and went inside. He testified that he noticed a pile of change on the floor and guns lying on a quilt and that the bedroom door was open, but he could not see if anyone was in the bed, which he said appeared messy. Dwayne said he called out several times but did not get an answer, so he closed the door and left the house. Dwayne also testified that he did not hear any gunshots while he was working in the area, but said that he doubted he would have heard them in any event.

A GBI crime scene specialist testified that there were no signs of forced entry into the home and that with the exception of the carport door, all the doors and windows were locked. Investigators found a computer, which had the monitor still turned on, in the back of Shell's truck while they were searching the premises the morning of the crime. The computer was analyzed and appellant's e-mails to Booth were discovered. Appellant was interviewed again and admitted that she and Booth e-mailed each other, but she said they only sent each other jokes. She also denied that Booth and she had a romantic relationship.

Booth was also interviewed, and he also denied having a romantic relationship with appellant and denied being at her house on December 14, 2007. He told officers that he was supposed to go to work that day but he decided not to go. Instead, he said he stopped by a convenience store to buy coffee and then went to another store and played video poker.

4

However, Booth's explanation of his whereabouts did not check out, and police also discovered that he and appellant had made numerous telephone calls to each other the morning of Shell's death. Booth told police that he had called appellant to see if she was going to work that day, but could not explain why there were so many calls between them. Booth also told the investigators that he never talked to appellant on the phone unless it was about work and that he had never communicated with her by computer over the Internet.

Investigators also learned that a neighbor saw a big truck with "dual" wheels drive slowly down the road toward appellant's house in the early morning hours on the day of the murder. Another neighbor told investigators that he had driven by the house that morning and that he had noticed fresh tire tracks from a big truck in the area. Several of Booth's co-workers also testified that they had seen Booth with a handgun in the months preceding the crime, and one witness testified that a photograph of a gun police showed him looked similar to the one Booth had in his possession two to three weeks before Shell was killed.

Booth's house was searched during the course of the investigation, and police seized two bottles of Trazodone, which is a prescription anti-depressant that also is sometimes used as a sleep aid, one of which was found in Booth's bedroom. Shell's blood was tested for a variety of substances, and one of those tests revealed that Shell had a therapeutic amount of Trazodone in his blood at the time of his death. Shell's father testified that appellant told him that Shell had taken one of his mother's sleeping pills the night before he was killed, but he said he could not identify the name of the sleeping pill that Shell supposedly took that night, and Shell's physician testified that he had never prescribed Trazodone to Shell.


2. Relying on Smith v. State, 250 Ga. 264 (297 SE2d 273) (1982), appellant contends that her conviction for conspiracy cannot stand because her

co-conspirator was acquitted by the same jury and same presentation of evidence. Citing only to secondary sources, this Court stated as dicta in Smith v. State,[1] that

> [i]n a joint trial of co-conspirators, a failure of proof as to one conspirator would amount to a failure of proof as to both, the evidence presented being identical. Co-conspirators, alleged to be the only two parties to the conspiracy, may not receive different verdicts when they are tried together. In such a situation, the verdicts are inconsistent because they reach different results regarding the existence of a conspiracy between these two parties based on exactly the same evidence.

Prior to 1986, Georgia adhered to the inconsistent verdict rule which did not allow such verdicts to stand in criminal cases. At first glance, Smith v. State might seem like precedent supportive of appellant's position. However, four years after we issued the opinion in Smith v. State, this Court unequivocally abolished the inconsistent verdict rule in Milam v. State, supra, 255 Ga. at 562. See also Tepanca v. State, 297 Ga. 47 (3) (771 SE2d 879) (2015). We did this to make Georgia law consistent with the United States Supreme Court's decision

---

[1] Smith v. State is distinguishable from the case at bar because the case involved co-conspirators who were tried separately in front of different juries. In that situation, this Court held that the conviction of one co-conspirator was not invalidated by the acquittal of the other co-conspirator. See also Hubbard v. State, 274 Ga. App. 639 (618 SE2d 690) (2005) (case involving co-conspirators who were tried separately).

in United States v. Powell, 469 U.S. 57 (105 SCt 471, 83 LE2d 461) (1984).  In

United States v. Powell, the defendant was acquitted of conspiracy to distribute

cocaine, but was convicted of some of the overt acts that facilitated the

conspiracy.  The Powell court concluded the inconsistency of the jury's verdicts

did not provide a basis to reverse the defendant's convictions.  In reaching this

conclusion, the court recognized that a jury has an "unreviewable power" to

render verdicts, including inconsistent verdicts, for "impermissible reasons."

(Internal quotations omitted.)  469 U.S. at 63.  Those reasons may include a

mistake, compromise, or lenity.  Id. at 65.

> [W]here truly inconsistent verdicts have been reached, the most that
> can be said ... is that the verdict shows that either in the acquittal or
> the conviction the jury did not speak their real conclusions, but that
> does not show that they were not convinced of the defendant's guilt.

(Punctuation and citation omitted.)  Id. at 64-65.  Allowing a defendant to

challenge inconsistent verdicts would be prone to speculation and would require

courts to make impermissible inquiries into the jury's deliberation process.  Id.

at 66.  The Powell court also reasoned that, in spite of its rejection of the

inconsistent verdict rule, the defendant would still be protected from "juror

irrationality" through the appellate review of the sufficiency of the evidence. Id. at 67.

Since Milam, this Court has consistently echoed the rationales set forth in Powell, that it is not for the courts to inquire into the jury's deliberations "for any inconsistency between guilty and not guilty verdicts." Turner v. State, 283 Ga. 17 (2) (655 SE2d 589) (2008).[2] See also Dugger v. State, 297 Ga. 120 (4) (772 SE2d 695) (2015); Guajardo v. State, 290 Ga. 172 (2) (718 SE2d 292) (2011); King v. Waters, 278 Ga. 122 (1) (598 SE2d 476) (2004); Robles v. State, 277 Ga. 415 (1) (589 SE2d 566) (2003). As such, we have refused to apply the inconsistent verdict rule not only in cases where a single defendant receives inconsistent verdicts as to two or more charges (see, e.g., Coleman v. State, 286 Ga. 291 (4) (687 SE2d 427) (2009)), but also in cases where co-defendants, who are tried together, receive inconsistent verdicts as to each other. See Lucas v. State, 264 Ga. 840 (452 SE2d 110) (1995); Parker v. Mooneyham, 256 Ga. 334 (349 SE2d 182) (1986), overruled on other grounds by State v. Freeman, 264 Ga. 276 (444 SE2d 80) (1994). There is only one very narrow

---

[2]The Georgia Court of Appeals has also followed Milam. See, e.g., Muldrow v. State, 322 Ga. App. 190 (1) (744 SE2d 413) (2013); Jones v. State, 318 Ga. App. 105 (1) (733 SE2d 407) (2012); Kimble v. State, 236 Ga. App. 391 (1) (512 SE2d 306) (1999).

exception to the rule against reversing inconsistent verdicts,[3] but that exception is not raised or indicated here.

The instant case is one of first impression only inasmuch as it concerns inconsistent conspiracy verdicts between jointly-tried co-conspirators and as it concerns the validity of the dicta in Smith v. State, supra. Now having considered the matter, we see no reason why Milam and its progeny would not be applicable to this case. Here, the jury convicted appellant of conspiracy to murder and acquitted her co-conspirator of same, but also found her co-conspirator guilty of the lesser crimes of making false statements. Given this outcome, it is plausible that the jury's decision constituted a mistake, compromise or lenity, none of which warrant intruding into its deliberations. This approach is consistent with federal cases which have followed Powell by declining to reverse the conspiracy conviction of a co-conspirator when the other co-conspirator has been acquitted by the same jury and under the same evidence. See United States v. Andrews, 850 F2d 1557, 1561 (11th Cir. 1988) ("Consistent verdicts are unrequired in joint trials for conspiracy: where all but

---

[3]See Guajardo, supra, 290 Ga. at 174 ("[R]eversal of an inconsistent verdict may occur in the rare instance where, instead of being left to speculate as to the jury's deliberations, the appellate record makes transparent the jury's rationale.")

9

one of the charged conspirators are acquitted, the verdict against the one can stand."). See also United States v. Collins, 412 F3d 515 (III) (4th Cir. 2005) (refusing to overturn a conspiracy conviction merely because a co-conspirator was acquitted by the same jury); United States v. Crayton, 357 F3d 560 (1) (A) (6th Cir. 2004) (Powell applies to cases concerning inconsistent verdicts amongst co-conspirators); United States v. Acosta, 17 F3d 538 (II) (B) (2nd Cir. 1994) ("In light of Powell, one defendant's conspiracy conviction does not become infirm by reason of jury verdicts of not guilty against all of his alleged coconspirators."); United States v. Lopez, 944 F2d 33, 40 (1st Cir. 1991) ("[A]s a simple matter of logic, the government's voluntary dismissal of a conspiracy charge against a defendant's only alleged coconspirator does not preclude proof beyond a reasonable doubt, at defendant's trial, that the defendant conspired with that same alleged coconspirator."); United States v. Valles–Valencia, 823 F2d 381, 382 (9th Cir. 1987) ("the acquittal of all conspirators but one does not necessarily indicate that the jury found no agreement to act"). Accordingly, the dicta in Smith v. State is disapproved inasmuch as it has been abrogated by Milam and its progeny.

The evidence was otherwise sufficient to convict appellant of the crimes for which she was charged. <u>Jackson v. Virginia</u>, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979). Therefore, the Court of Appeals did not err when it affirmed appellant's conviction for conspiracy to murder.

<u>Judgment affirmed. All the Justices concur.</u>