304 Ga. 658
FINAL COPY

S18A1454. WILLIAMS v. THE STATE.

BOGGS, Justice.

After a trial in April 2016, a jury found Edwin Williams guilty of felony

murder and criminal attempt to commit armed robbery in connection with the

death of Tyler Johnson.[1] Williams was sentenced to life with the possibility of

parole. He appeals from the trial court's denial of his amended motion for new

trial, asserting that the evidence was insufficient to convict him as a party to the

---

[1] The crimes occurred on January 22, 2014. On March 10, 2014, a Tift County grand jury indicted Williams for malice murder, felony murder based on criminal attempt to commit armed robbery, and criminal attempt to commit armed robbery. Williams was tried before a jury on April 26-27, 2016. The jury acquitted Williams of malice murder but found him guilty of felony murder and criminal attempt to commit armed robbery. The trial court sentenced Williams to life imprisonment with the possibility of parole on both counts, which was error. See Division 2, infra. Williams filed a motion for new trial on May 26, 2016, which was amended on February 12, 2018. The trial court denied his amended motion on April 6, 2018. On April 20, 2018, Williams filed a notice of appeal in the Court of Appeals. A motion to transfer the appeal to this Court was filed on June 13, 2018. On June 19, 2018, the Court of Appeals transferred the appeal to this Court, and it was docketed for the August 2018 term. The case was submitted for decision on the briefs.

crime. Finding that the evidence was sufficient, we affirm most of the judgment but vacate a portion of the sentence as discussed below.

In the light most favorable to the verdict, the evidence presented at trial showed that, on January 21, 2014, the night before the murder, Williams and his co-indictees, Trevon Rushton, Kelly Warren, and Carrington Hollis, drove from Thomasville, Georgia, where they lived, to Omega, Georgia, to visit Rondarian Jones, another co-indictee, at his house. In a bedroom at Jones' house, Williams, Jones, Rushton, and Hollis were present for a discussion about "hitting a lick," a phrase that Hollis testified means committing a robbery. The conversation occurred while two guns were lying on the bed. After the discussion, Williams, Rushton, Jones, and Hollis left Jones' house, and Jones drove them to the victim's neighborhood, where he let them out of the car and they walked around. Jones left to get marijuana, and he picked them up in the same neighborhood.

Later that night, Williams, Rushton, and Warren traveled back to Thomasville, and Williams spent the night with Rushton and Warren. They picked up Hollis the next day on their way back to Omega. While en route to Omega, Rushton told Warren that, upon arriving at the victim's home, she should go to the door and knock to get the victim to the door.

2

The group picked up Jones and drove to the victim's neighborhood. Warren drove up and down Highway 319, a road in the victim's neighborhood, multiple times. She paused, and the four men got out of the car on Highway 319 before she drove away. The men were dressed in black hoodies, one had dreadlocks, at least one had a bandanna partially covering his face, and they had guns. Warren drove the car past the victim's house and parked it down the street in front of a church. Warren then got out of the car, walked to the front door of the victim's house, and knocked. Just as Warren was getting to the door, the men walked past the side of the victim's house and came onto the porch. When the victim opened the door, he greeted Warren and Rushton but then saw Jones, looked scared, and slammed the door. When the door was closed, Jones fired two shots that passed through the door. One bullet hit the victim in the left side of his head and passed through his brain. Williams, Jones, Hollis, Rushton, and Warren were all standing on the porch at the front door while the shooting occurred. Warren testified that the gun that Jones used was a silver revolver.

A local mechanic watched four males exit a car and walk toward the victim's house. When he heard the gunshots, he ran into his shop as the four males ran away from the victim's house in his direction and crossed over

Highway 319. After Williams and the other male co-indictees ran back across Highway 319 and across others' properties, Warren — who had gotten back in her car and driven up the street — picked them up and took them to Jones' house.

Jones went into his house alone, carrying a .38 special derringer. In the house, Jones was "acting crazy," saying that "they shouldn't have rode with him," and admitting that "he shot through the door." After dropping off Jones, Williams, Rushton, Hollis and Warren left in Warren's car.

Officers arrived at the victim's house, where they found him lying on the floor and bleeding profusely from his head. He later was transported to a trauma center, but he died of his injuries. Another witness to the shooting gave officers a general description of the four men and one woman who were responsible for the shooting, a description of their vehicle, and the vehicle's tag number. Officers used the information to issue a "Be On the Look Out" bulletin for a white Impala driven by a white female with three or four African-American males in it. A Department of Natural Resources agent heard the bulletin, spotted the vehicle, and pursued the suspects. A sergeant of the Tift County Sheriff's Department followed the agent in pursuit, and another officer of the Tift County

4

Sheriff's Department followed the sergeant. The suspects' car stopped at a store, and the officers positioned their cars to prevent the suspects' car from leaving. The officers then instructed Williams, Hollis, Rushton, and Warren to get out of the car and arrested them. Officers also searched the car and found hoodies and bandannas.

Police never recovered a revolver, but they found a derringer in Jones' house, after someone living there told an investigator that two guns had been involved: one that was hidden in the house's air vent and a second that was supposedly used by Rushton and had made its way to Thomasville. During the autopsy, the pathologist recovered the fatal bullet from the victim's brain. After comparing it to bullets which were test fired from the derringer that was recovered from Jones' house, the State's ballistics examiner was unable to determine whether the derringer fired the fatal shot due to damage to the firearm, but it was of the same caliber as the gun that was used to kill the victim.

1. In his sole enumeration of error, Williams argues that the evidence was insufficient to convict him because it established only that he was present at the crime scene and for one conversation about "hitting a lick." We disagree.

When evaluating a challenge to the sufficiency of the evidence, we review

whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Harper v. State, 298 Ga. 158, 158 (780 SE2d 308) (2015). In making that determination, we do not reweigh evidence or resolve conflicts in testimony; instead, we review the evidence in a light most favorable to the verdict and defer to the jury. Id.

Williams was convicted of felony murder with criminal attempt to commit armed robbery as the predicate felony. "Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime." OCGA § 16-2-20 (a).

> A party to a crime is one who intentionally aids or abets the commission of the crime, or intentionally advises, encourages, hires, counsels, or procures another to commit the crime. OCGA § 16-2-20 (b) (3) and (4). Whether a person is a party to a crime may be inferred from that person's presence, companionship, and conduct before, during, and after the crime.

(Citation and punctuation omitted.) Conway v. State, 281 Ga. 685, 687 (1) (642 SE2d 673) (2007). "Whether a defendant was a party to a crime is a question for the fact-finder." (Citation omitted.) Coggins v. State, 275 Ga. 479, 480 (1) (569 SE2d 505) (2002). To prove that Williams was a party to the crimes, the State had to prove that Williams shared a common criminal intent with his co-

6

indictees. "Evidence of a defendant's conduct prior to, during, and after the commission of a criminal act . . . authorize[s] the defendant's conviction for commission of the criminal act if a jury could infer from the conduct that the defendant intentionally encouraged the commission of the criminal act." (Citation and punctuation omitted.) Sims v. State, 281 Ga. 541, 542 (1) (640 SE2d 260) (2007).

Substantial direct and circumstantial evidence supported the jury's conclusion that Williams was a party to the felony murder with criminal attempt to commit armed robbery as the underlying felony. As summarized above, on the night before the murder, Williams and his co-indictees had discussions about "hitting a lick," with guns lying nearby. After those discussions, Williams and his co-indictees went to the victim's neighborhood and walked around, from which the jury could infer that they were surveying the neighborhood. That night, Williams stayed with two of the co-indictees, and he met back up with the rest of the group the next day.

On the day that the crimes occurred, some of Williams' co-indictees wore clothing to disguise their features. They brought firearms and had a plan to get the victim to come to the door. Williams accompanied them to the victim's

house and stood with the group at the victim's door when the victim opened it and while he was shot.

Once the shots were fired, Williams ran away from the scene and got in the getaway car with the other men, including Jones, who had at least one firearm. Even though the car stopped to drop off Jones, Williams remained inside, and he continued fleeing with the other co-indictees until police stopped the car at a country store where he was arrested.

Williams' conduct before, during, and after the offense supported the jury's conclusion that he shared an intent to commit an armed robbery of the victim. And because "the fatal shooting of an armed robbery victim may be said to be a probable consequence of the armed robbery, and all the participants in a plan to rob are criminally responsible for the act of each committed in the execution of the plan and which may be said to be a probable consequence of the unlawful design," Coggins, supra, 275 Ga. at 481 (1), there was sufficient evidence for the jury to conclude that Williams was a party to the crime of felony murder.

2. At Williams' sentencing hearing, the District Attorney noted that the criminal attempt to commit armed robbery count would merge with the felony

murder count so that the trial court would be authorized to sentence for only felony murder. The trial court then stated that it would sentence Williams to life with the possibility of parole. While we affirm Williams' conviction and sentence for felony murder, the final disposition order, contrary to the court's oral pronouncement at Williams' sentencing hearing, reflects an additional sentence of life with the possibility of parole for criminal attempt to commit armed robbery. However, a separate sentence for the criminal attempt to commit armed robbery is not authorized because that count merged with the felony murder count as a matter of law. See Moore v. State, 275 Ga. 51, 53 (4) (561 SE2d 819) (2002). We therefore vacate the sentence for criminal attempt to commit armed robbery.

Judgment affirmed in part and vacated in part. All the Justices concur.

Decided November 5, 2018.

Murder. Tift Superior Court. Before Judge Cross.

Conger & Smith, Gregory D. Smith, for appellant.

C. Paul Bowden, District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General, for appellee.