**FIRST DIVISION
BARNES, P. J.,
MERCIER and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**August 21, 2019**

# In the Court of Appeals of Georgia

A19A1632. ALLEN v. THE STATE.

BROWN, Judge.

Paul Allen appeals from his conviction of theft by taking and asserts in his sole enumeration of error that the State presented insufficient evidence to show that he "participated in the theft of the vehicle." For the reasons explained below, we disagree and affirm.

The record shows that Allen was tried jointly with Joshua Dickerson and Gabriel Toney and that each of them was charged with armed robbery (wallet), aggravated assault (pointing a firearm), theft by taking (motor vehicle), and possession of a firearm during the commission of a felony. The jury found all three men guilty of theft by taking and found them not guilty of the remaining charges. On

appeal from a criminal conviction, the standard for reviewing the sufficiency of the evidence

> is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. This Court does not reweigh evidence or resolve conflicts in testimony; instead, evidence is reviewed in a light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence.

(Citations and punctuation omitted.) *Hayes v. State*, 292 Ga. 506 (739 SE2d 313) (2013).

So viewed, the record shows that the victim became acquainted with someone he knew as "Tony" on a social networking website. On May 1, 2013, the 31-year-old victim decided to travel from DeKalb County, where he lived, to Newton County to meet "Tony" to "hangout" and smoke marijuana. The victim denied that he was meeting "Tony" to conduct a drug deal. He spoke to "Tony" by cell phone around 10:00 p.m. after he had difficulty finding the location because his GPS could not find the address provided by "Tony" (340 Mountainview). After "Tony" directed him to the location, the victim met "Tony" and his cousin, both of whom were standing outside a house. After "Tony" explained that his cousin needed a ride down the street, they both got into the victim's car, with "Tony" in the front passenger seat and the

2

cousin seated behind "Tony" in the rear passenger seat. The victim testified that he was "thrown off that the cousin came along."

The victim testified that after he drove past a couple of houses, he "was instructed to pull into the driveway" of a house. The cousin did not immediately exit the car, and the victim testified that both "Tony" and the cousin appeared to be "stalling for time" as "Tony" rolled a marijuana cigar, which made him feel uneasy about the situation. When he saw through his rear-view mirror a man "in an orange hoodie walk directly across the yard, behind the . . . trunk of [his] car," the victim asked his passengers if they were expecting someone else. Both passengers said no, and "the next thing [the victim knew,] the car door [was] snatched open, [and a] gun [was] in [his] face." The victim testified that he was afraid for his life because the gun "looked real" and he could see bullets inside it. Although the man was wearing a blue bandana across his face, the victim noticed that his eye "color was unique for an African-American male" and that his eyes had a distinctive shape. When the gunman snatched open the door, the victim screamed in fear and the gunman said, "Shut the fuck up. Give me your shit." After the victim stated that his wallet was in the glove box, "Tony" grabbed his wallet and "put it in his pocket." The victim testified that

3

after he observed that neither of his passengers looked nervous or scared, he "realized [he] had been set up."

After "Tony" removed the wallet from the glove box, the victim heard someone say, from what sounded like the back seat of the car, "Get his phone. Get it." At this point, the victim told them that they had his car and wallet and bolted from the car. As he ran away, he heard the gunman state, "Fuck him. Let's go." The victim hid behind a fence in a dark yard and watched his car drive by before calling the police. He did not see "Tony" or his cousin run from the car. He acknowledged during cross-examination that no one told him to run or leave the car.

While the victim was speaking with a detective in the area where he was robbed, the police stopped a man riding by on a bicycle. The man identified himself as Gabriel Toney and agreed to speak with police. A detective asked him to empty his pockets for safety, and he pulled out a blue cloth rag. Other than the blue rag, Toney had nothing in his pockets that connected him to the robbery. He told the officer that he had been with Joshua Dickerson and Paul Allen that evening. The victim noticed the shape and color of Toney's eyes on the scene, and ultimately identified Toney as the gunman.

Police investigation quickly revealed that the phone number "Tony" gave to the victim belonged to Allen. After learning this information and that Allen and Dickerson could be found at 235 Mountainview Drive, the police went to that location and received permission from the homeowner to search the residence. A search of the room shared by the two men revealed bullets wrapped inside a blue bandana. None of the items taken from the victim were located in the room shared by Allen and Dickerson. Allen consented to a search of his cell phone which revealed communication between it and the victim's cell phone. The victim identified Allen as the person he knew as "Tony" and Dickerson as the cousin who sat in the back seat.

The victim testified that because he had the key to the "push start" vehicle in his pocket when he fled, the car would only be able to drive for two miles before shutting down. The police recovered his vehicle on Stoneview Circle in a "subdivision nearby" several hours after it was stolen. Fingerprints taken from the driver's door and rear passenger window did not match Toney, Allen, Dickerson, or the victim.

Although Toney did not testify at trial, he did speak with police less than five hours after the theft. He acknowledged that he was "chilling" at Dickerson's home

5

with Dickerson and "Paul" from 8:30 p.m. until 10:30 p.m. He denied all involvement in the robbery, yet also told the police that the car might have been left on a street in a nearby neighborhood like Wellington Oaks, Stoneview, or Country Woods.

Dickerson also spoke with police within five hours of the theft, but did not testify at trial. He initially denied any knowledge of or involvement in the theft, but later admitted getting into the victim's car and being robbed while they were sitting in the car. He stated that he did not see a gun and did not know who robbed them. He explained that he got out of the car "when everything was happening" and ran home. He admitted that he did not call 911 after he fled. He claimed that the victim met with them that night "to chill." He acknowledged being with Toney and Allen that evening.

Dickerson's mother, with whom he lived, testified that Dickerson came home the evening of the robbery looking like "he was actually having an asthma attack" and "almost in tears." When she asked him what was wrong, he stated that he had been robbed and that Allen was behind him. Allen returned approximately five minutes later. When she urged him to call the police, he said he did not want to because "he was home and he was safe." She did not call the police herself and did not tell the

police Allen and Dickerson had been robbed when the police arrived and asked to search Allen and Dickerson's room.

In a statement provided to police around five hours after the robbery, Allen initially denied knowing anything about the robbery. After the police confronted him with evidence showing that he and the victim contacted one another by phone, Allen admitted that he had communicated with the victim on a social media website and that they met to smoke "a couple of blunts." He denied that they were meeting for a deal. He explained that someone came up to the driver side door and said "give up everything," as well as "give up all of the money and . . . where is the money?" Allen told the police that the robber took his weed and the money out of his pockets. After the victim left them, the robber got in the car, drove to the top of Mountainview Drive, and made them get out. He admitted that he had been with Toney most of the day and that Toney left before the victim arrived; he could not tell who the robber was because the robber was wearing a bandana over his face.

At trial, Allen testified that he did not call 911 after the robbery because he had been smoking marijuana and was scared. For the same reason, he did not initially tell the officers about his connection with the victim. He explained for the first time that his conversation with the victim on a social media website related to "a transaction

7

with marijuana" and that the victim was bringing more marijuana in case Allen wanted to buy it. As he was rolling the marijuana provided by the victim, the robbery took place. He did not see a gun because he panicked and put his head down. He denied getting the victim's wallet out of the glove box and claimed that the victim was lying. He stated that the victim handed his own wallet and the marijuana in Allen's hands to the gunman. He testified that he could not flee the car with the victim because "the car was pulling off and going down the street." He "tried to get out of the car, but the car was moving too fast." As he had an injury to his right ankle, he needed more time to place his left foot on the ground to exit the car.

We find this evidence sufficient to support Allen's theft by taking conviction under the standard set forth in *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). As an initial matter, we note that the Supreme Court of Georgia has made it very clear that the inconsistent verdict rule shall not be applied in this State. See *Thornton v. State*, 298 Ga. 709, 712-715 (2) (784 SE2d 417) (2016). The rationale for its rejection of this rule is "that a jury has an 'unreviewable power' to render verdicts, including inconsistent verdicts, for 'impermissible reasons.' Those reasons may include a mistake, compromise, or lenity." (Citation omitted.) Id. at 713 (2). See also *Milam v. State*, 255 Ga. 560, 562 (2) (341 SE2d 216) (1986).

Accordingly, even though Allen was acquitted of armed robbery, aggravated assault, and possession of a firearm during the commission of a felony, any evidence offered during the trial may be used to evaluate the sufficiency of the evidence for his theft by taking conviction. See *Houseworth v. State*, 348 Ga. App. 119, 124 (1) (c) (820 SE2d 231) (2018).

The trial court charged the jury on the law regarding party to a crime. Under this theory, "[o]ne is culpable as a party to a crime, even if he did not directly commit it, if he intentionally aids or abets in the commission of the crime or intentionally advises, encourages, hires, counsels, or procures another to commit the crime." (Citations and punctuation omitted.) *Stewart v. State*, 243 Ga. App. 860, 861 (1) (534 SE2d 544) (2000). "[E]ven a passenger in a stolen automobile may be convicted as a party to the crime of theft by taking if there are circumstances from which one's participation in the criminal intent may be inferred." (Citation and punctuation omitted.) *In the Interest of D. J. E.*, 266 Ga. App. 807, 810 (1) (598 SE2d 108) (2004). "While it is true that mere presence at the scene of a crime is insufficient to convict one of being a party to the crime, the jury may infer criminal intent from the person's conduct before, during, and after the commission of the crime." (Citation

and punctuation omitted.) *Gant v. State*, 291 Ga. App. 823, 825 (1) (662 SE2d 895) (2008).

In this case, the State presented evidence showing that Allen used a false name on social media to meet with the victim to smoke marijuana, gave a false address for their meeting place, directed the victim to another address where the gunman appeared, seemed to be stalling for time before the gunman's arrival, did not appear frightened when the gunman appeared, kept the victim's wallet after taking it out of the glove box, left with the gunman after the gunman stated "Fuck him. Let's go[,]" and did not call 911 even though he claimed the gunman also took his money. Additionally, Dickerson, whom Allen claimed needed to be dropped off down the street, remained in the car before the gunman appeared and directed that someone get the victim's cell phone during the robbery. Finally, Allen, Toney, and Dickerson spent time together before the robbery. Based upon these facts and circumstances, the jury was authorized to reject Allen's innocent explanation for his acts and find him guilty of theft by taking. See *Gant*, 291 Ga. App. at 825 (1).

*Judgment affirmed. Barnes, P. J., and Mercier, J., concur.*