**FIRST DIVISION**
**BARNES, P. J.,**
**BROWN and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**September 22, 2022**

# In the Court of Appeals of Georgia

A22A1339. WRIGHT v. THE STATE.

BARNES, Presiding Judge.

Following a trial with a codefendant, the jury found Kecia Leann Wright guilty of criminal attempt to commit murder and aggravated assault stemming from the shooting of her husband.[1] The trial court subsequently denied her motion for new trial. On appeal, Wright contends that the evidence was insufficient to support her convictions and that the trial court erred in denying her motion for new trial on the general grounds. Wright emphasizes that there was no evidence that she directly committed the crimes and that the State's theory of the case was that her codefendant carried out the crimes at her behest, but the jury acquitted her codefendant. Additionally, Wright challenges the trial court's denial of her plea in bar, contending

---

[1] The jury acquitted Wright of criminal solicitation.

that the charges brought against her were barred by the applicable four-year statute of limitation. For the reasons discussed more fully below, we affirm.

Construed in favor of the verdict,[2] the evidence showed that Wright and Kentrick Lindo were married for many years and had three children together. Wright also had an older daughter from a previous relationship who sometimes lived with them. Wright and Lindo had a tumultuous marriage marked by verbal abuse and struggles with alcohol.

*Wright's Plans to Kill Lindo.* On several occasions during their marriage, Wright devised plans to kill Lindo, confiding in her oldest daughter and oldest son that she wanted Lindo dead because he allegedly raped her and because she wanted to collect on his $1,000,000 life insurance policy. On one occasion, Wright told her oldest son, who was then around nine years old, that she had a plan to stage a burglary at their house that would result in Lindo being killed. The plan included tying up the son and Wright and then having someone break in and shoot Lindo. The son did not tell Lindo about Wright's plan. On another occasion, the son was sitting on the couch, and Wright came down the stairs, confided in him that she had just

---

[2] See *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

poisoned Lindo's food, and had her son come into the kitchen, where she showed him a "little white container" that contained the poison. Wright later told her oldest daughter about the poisoning incident as well. Lindo did not eat the food. The son and daughter were too afraid to tell Lindo about the attempted poisoning.

Another incident occurred in 2010. That year, there was a fire at the family's residence that began late at night in the upstairs bedroom where Lindo was asleep. Wright and the children got out of the house before the fire department arrived, while Lindo stayed inside and attempted to extinguish the fire. Lindo was unsuccessful in putting out the fire, and the upper level of the house was damaged and had to be rebuilt, but he escaped from the house without any serious injuries. While the fire department put out the fire, Wright confided in her oldest daughter, who was around 20 years old, that as Lindo was sleeping, she started the fire and staged it to look like a candle accidentally fell on the bed. The daughter did not tell anyone about what Wright disclosed to her because she was scared and did not want to get her mother in trouble.

The same year that she started the fire, Wright asked one of her oldest daughter's friends to shoot and kill Lindo. The daughter and her friend named Rico were outside talking when Wright approached them. Wright asked Rico to shoot and

kill Lindo in return for money because, she claimed, Lindo had raped her. Rico took $3,000 from Wright, but he did not carry out the shooting because Wright later changed her mind and told him not to do it. The daughter lost contact with Rico afterwards. She did not tell anyone about the incident because she was scared and felt torn between Wright and Lindo.

Wright made a similar request to have Lindo killed in 2011. The oldest daughter and her then boyfriend, Onan Allan, were together when Wright came into the room drunk and began talking with them. Wright asked Allan to shoot and kill Lindo in return for money, again accusing Lindo of raping her. Wright told Allan that she would pay him out of the life insurance proceeds. Allan was hesitant, but Wright spoke with him on a second occasion when she was intoxicated, again in the presence of her daughter, and begged Allan to carry out the killing. The daughter urged Allan not to do it because she knew that Wright was not joking, but Allan agreed to do it in return for some of the life insurance proceeds. Lindo was not at the house when these conversations occurred.

*The Shooting.* The shooting incident that formed the basis for the charges occurred on May 25, 2011. That night, Lindo was driving his convertible through an intersection in DeKalb County down the street from his house. As he drove, Lindo

4

saw a male suddenly come out of the bushes and fire several gunshots at him, but he was unable to identify the shooter at the time. One of the bullets passed through Lindo's back and lodged near his heart. He was able to drive the short distance home, where his son called 911. Law enforcement officers and emergency medical personnel arrived at the house, and Lindo was transported to the hospital, where he was treated for his gunshot wound and released several days later. The trauma surgeon who treated Lindo did not remove the bullet lodged near this heart because of the risks involved in doing so.

The day of the shooting, Wright's oldest daughter received a phone call from Allan in which he confided in her, "It's done." The daughter then received a phone call from Wright telling her that Lindo had been shot. The daughter rushed over to the house but did not tell the police or anyone else what she knew about the shooting because she was scared and was unsure how to handle the situation. After the shooting, the daughter ended her relationship with Allan.

When Lindo came home from the hospital, Wright told her oldest son that someone was supposed to come shoot Lindo and "finish the job." Wright did not identify the potential shooter to her son, and the shooting never occurred. Later one night, when Wright and Lindo were arguing, Wright encouraged her son to stab

5

Lindo in the area where the bullet fragment was lodged so that it would kill him, but her son refused to do so. The son did not tell Lindo about these incidents when they occurred.

*The Initial Investigation.* Immediately after the shooting, a police officer responded to Lindo's house and observed that Lindo had a gunshot wound and that his car windshield contained several bullet holes. Lindo gave a general description of the shooter but told the officer that he did not know who shot him. Lindo could not provide many details because he was in pain and was focused on getting medical attention.

Detectives were called to the scene shortly after the shooting and began their investigation. They located the intersection where Lindo was shot and recovered six shell casings there. There were no video surveillance cameras that had recorded the shooting, and none of the people present near the scene had been there when the shooting occurred or had any information about what had happened. The detectives interviewed Wright, who had been at home at the time of the shooting, and Lindo was interviewed again at the hospital, but the detectives were unable to develop leads on any potential suspects. The son and daughter were not interviewed. Lindo's car was transported to the crime lab for processing, where two bullet fragments and bloody

clothing were recovered but nothing else of forensic value. The detectives ultimately suspended their investigation in May 2012 for lack of any leads.

*The Children's Disclosures.* Wright and Lindo later divorced, and Lindo subsequently remarried. In November 2014, the oldest daughter was talking with Lindo and his new wife when Lindo asked her if she knew who had been trying to kill him. The daughter for the first time disclosed to Lindo and his new wife everything she knew about the shooting and about Wright's repeated attempts to kill Lindo. According to the daughter, Lindo was "shocked" and was "hurt that [she] didn't tell him sooner."

In 2015, the son composed a rap song entitled "Saving Dad's Life," which, as described by the son, included lyrics about "basically everything that happened as far as with [Wright] trying to harm [Lindo]." The son played the song for Lindo, who "finally caught on" to the meaning of the lyrics.[3] Shortly thereafter, in March 2015, Lindo commented to his oldest son that he thought Wright "tried to burn [him] in the

---

[3] According to the son, he had composed rap songs "since like 2012" that including lyrics referring to Wright's efforts to harm Lindo and would play them to Lindo, but Lindo did not realize what the lyrics were about until he heard "Saving Dad's Life." The son explained that he would "mix topics" when he wrote rap songs and would "go from one topic, go to another and then . . . switch and . . . come back to that topic."

house fire," after which the son told Lindo in detail what he knew about Wright's efforts to kill him. About a week and a half later, the son made the same disclosures to a school counselor.

*The Reopened Investigation.* In April 2015, Lindo and his new wife spoke with the lead detective who had been assigned to the shooting investigation about the new information they had learned from the daughter and son. The detective subsequently interviewed the daughter, and she identified Allan in a photographic lineup. The detective also interviewed the son, who identified Allan in a photograph as well. Additionally, the detective obtained screenshots of text messages that Wright wrote to Lindo, copies of text messages between Wright and Lindo's new wife, and conversations between Wright and Lindo's new wife recorded on the latter's cell phone. In the text messages and recordings, Wright did not expressly state that she was involved in the shooting. However, in her text messages to Lindo, Wright wrote, among other things, that she was "so sorry," that she "made a bad mistake and a f\*\*cked up decision," and that "this was a huge mistake." In her text messages to Lindo's new wife, Wright wrote, "Please don't be mad at me. I at that point. F\*\*cked big time. All I can ask for is forgiveness." And in one of her recorded phone conversations with Lindo's new wife, Wright read out loud a text message that she

8

had composed to Lindo in which she promised that she would "never hurt [him] again" and wrote that she was "really sorry," that "this is the worst thing that [she] ever did," and that "once it happened, [she] said no more" because she "couldn't bare [sic] the pain [she] caused." Based on the new information received by the detective, he sought and obtained warrants for the arrests of Wright and Allan.

*The Criminal Proceedings.* In April 2017, Wright and Allen were jointly indicted on charges related to the shooting incident. Wright filed a plea in bar, contending that the charges against her were barred by the applicable four-year statute of limitation. Following an evidentiary hearing, the trial court denied the plea in bar, concluding that the limitation period had been tolled until at least November 2014, when Lindo first learned that Wright was involved in the shooting.

Wright and Allan were tried jointly in November 2019. The State's theory presented to the jury was that Wright procured Allan to shoot and kill Lindo in return for money and that Allan was the May 2011 shooter who tried unsuccessfully to kill Lindo. By the time of trial, Lindo had died of unrelated causes. Lindo's new wife had moved to a different state, and she was subpoenaed to testify at trial but was too ill to travel to Georgia. At trial, the State's principal witnesses were Wright's daughter and son, who testified about what Wright had told them about the shooting incident

9

and her other plans to kill Lindo and about what they had personally witnessed, as summarized above. The State also called as witnesses the law enforcement officers involved in the case, among other witnesses, and introduced into evidence the aforementioned text messages. The recording of the previously quoted phone conversation between Wright and the new wife was introduced into evidence only against Wright. After the State rested, Wright and Allan elected not to testify and did not call any defense witnesses. The jury found Wright guilty of criminal attempt to commit murder and aggravated assault but acquitted her of criminal solicitation, and the jury acquitted Allan of all charges. Wright subsequently filed a motion for new trial, as amended, which the trial court denied, resulting in this appeal.

1. Wright contends that the evidence was insufficient to support her conviction for criminal attempt to commit murder.[4] We disagree.

---

[4] Wright also challenges the sufficiency of the evidence to support her conviction for aggravated assault, but her challenge is moot because her conviction on that count was merged for sentencing and she was sentenced only on the attempted murder count. See *Herring v. State*, 363 Ga. App. 686, 689 (2) (872 SE2d 459) (2022). See also *Rosser v. State*, 308 Ga. 597, 599 (1) (842 SE2d 821) (2020) (holding that challenges to the sufficiency of the evidence on several counts were moot because "those counts were either vacated by operation of law or merged for sentencing").

When a defendant challenges the sufficiency of the evidence to support [her] criminal convictions, we ask only whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. So long as there is some competent evidence, even though contradicted, to support each element of the State's case, the jury's verdict will be upheld.

(Citation and punctuation omitted.) *Torres v. State*, 353 Ga. App. 470, 476 (1) (838 SE2d 137) (2020). See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). "Our limited review leaves to the jury the resolution of conflicts in the evidence, the weight of the evidence, the credibility of witnesses, and reasonable inferences to be made from basic facts to ultimate facts." (Citations and punctuation omitted.) *McGruder v. State*, 303 Ga. 588, 590 (II) (814 SE2d 293) (2018).

"A person commits the offense of criminal attempt when, with intent to commit a specific crime, he performs any act which constitutes a substantial step toward the commission of that crime." OCGA § 16-4-1. And "[a] person commits the offense of murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being." OCGA § 16-5-1 (a). The indictment alleged that Wright and Allan, individually and as parties to the crime, committed the

offense of criminal attempt to commit murder by shooting Lindo, an act which constituted a substantial step toward the commission of the crime.

The evidence as summarized above was sufficient to enable a rational trier of fact to find Wright guilty beyond a reasonable doubt of criminal attempt to commit murder as alleged in the indictment. See *Jackson*, 443 U. S. at 319 (III) (B). Although there was no evidence that Wright was the shooter, "[a] participant to a crime may be convicted although [she] is not the person who directly commits the crime. OCGA § 16-2-20." *Burks v. State*, 268 Ga. 504, 505 (491 SE2d 368) (1997). Any "person who intentionally aids or abets in the commission of a crime or intentionally advises, encourages, hires, counsels or procures another to commit the crime may be convicted of the crime as a party to the crime." Id. See OCGA § 16-2-20 (b) (3), (4). And "[e]vidence of a defendant's conduct prior to, during, and after the commission of a criminal act authorizes the defendant's conviction for commission of the criminal act if a jury could infer from the conduct that the defendant intentionally encouraged the commission of the criminal act." (Citation and punctuation omitted.) *Williams v. State*, 304 Ga. 658, 661 (1) (821 SE2d 351) (2018).

Here, the oldest daughter testified that Wright asked Allan to shoot and kill Lindo in return for money, that Allan agreed to do so, that Lindo was then shot, and

12

that shortly thereafter Allan called the daughter and confirmed that the shooting had occurred. In turn, the oldest son testified that after the shooting, Wright told him that someone else was supposed to "finish the job" and asked the son to kill Lindo by stabbing him near where the bullet fragment was lodged in his chest. Additionally, the daughter and son testified about the prior instances in which Wright sought to kill Lindo or have him killed by someone else, and the State introduced into evidence the test messages and phone recording in which Wright appeared to apologize for the shooting. Viewing this evidence in the light most favorable to the verdict, the jury was authorized to determine that Wright aided, abetted, encouraged, hired, and/or procured Allan to shoot and kill Lindo and thus was a party to the crime of criminal attempt to commit murder. See OCGA § 16-2-20 (3), (4); *Williams*, 304 Ga. at 661 (1); *Burks*, 268 Ga. at 505.

Wright, however, maintains that the acquittal of Allan of attempted murder in the same trial requires the reversal of her conviction. But our Supreme Court has

> abolished the rule that required reversal in cases of inconsistent verdicts. *Milam v. State*, 255 Ga. 560 (341 SE2d 216) (1986). Although *Milam* involved one defendant and inconsistent verdicts on different counts of the same indictment, [the Supreme Court has] held that the principles leading to [its] decision in *Milam* "are equally applicable to a situation where the jury returns inconsistent verdicts against co-defendants."

13

> *Parker v. Mooneyham*, 256 Ga. 334, 335 (349 SE2d 182) (1986). For
> this reason, [Wright] may not attack [her] conviction on the ground that
> the jury chose to acquit [her] co-defendant.

*Lucas v. State*, 264 Ga. 840, 840 (2) (452 SE2d 110) (1995) (affirming defendant's

murder conviction where the State presented evidence that the defendant paid his

codefendant to kill the victim, and concluding that the fact that the defendant was

tried jointly with his codefendant who was acquitted of committing the murder did

not require reversal of the defendant's conviction). See OCGA § 16-2-21 ("Any party

to a crime who did not directly commit the crime may be . . . convicted[ ] and

punished for commission of the crime upon proof that the crime was committed and

that he was a party thereto, although the person claimed to have directly committed

the crime . . . has been acquitted."); *Larry v. State*, 266 Ga. 284, 285 (1) (466 SE2d

850) (1996) (holding that codefendant's acquittal on armed robbery count in joint

trial "did not provide [the defendant] with a basis for attacking his convictions");

*Dixon v. State*, 157 Ga. App. 550, 550 (2) (278 SE2d 130) (1981) (noting that "our

courts have held that consistency is not required as between principal actors and those

who share guilt as accessories"). Accord *Thornton v. State*, 298 Ga. 709, 714-715 (2)

(784 SE2d 417) (2016) (concluding that jury's acquittal of codefendant for

14

conspiracy to commit murder did not require reversal of defendant's conviction for conspiracy to commit murder because the inconsistent verdict rule has been abolished in Georgia).

Nevertheless, Wright argues that the jury's verdicts should be classified as repugnant rather than merely inconsistent. See generally *McElrath v. State*, 308 Ga. 104, 108 (2) (839 SE2d 573) (2020) ("There are three main classes of contradictory verdicts: 'inconsistent verdicts,' 'mutually exclusive verdicts,' and 'repugnant verdicts.'") (footnote omitted).[5] We are unpersuaded.

"As a general rule, inconsistent verdicts occur when a jury in a criminal case renders seemingly incompatible verdicts of guilty on one charge and not guilty on another" against an individual defendant or among codefendants, and, as noted above, "the rule that inconsistent verdicts require reversal" has been abolished. (Emphasis omitted.) *McElrath*, 308 Ga. at 108 (2) (a). "Inconsistent verdicts are permitted to stand because the jury's rationale is not apparent from the record and courts generally

---

[5] Verdicts are "mutually exclusive" when the jury renders "*two guilty* verdicts [that] cannot legally exist simultaneously." (Emphasis in original.) *McElrath*, 308 Ga. at 110 (2) (b). In that circumstance, "where it is both legally and logically impossible to convict on both counts, a new trial should be ordered." (Citation and punctuation omitted.) Id. The "mutually exclusive" category of contradictory verdicts is not at issue in this case.

are not permitted to make inquiries into the jury's deliberation process." *State v. Owens*, 312 Ga. 212, 216-217 (1) (b) (862 SE2d 125) (2021).

In contrast, verdicts are repugnant "when, in order to find the defendant not guilty on one count and guilty on another, the jury must make *affirmative* findings shown on the record that cannot logically or legally exist at the same time." (Emphasis in original.) *McElrath*, 308 Ga. at 111 (2) (c). Repugnant verdicts "occur in the rare instance where, instead of being left to speculate as to the jury's deliberations, the appellate record makes transparent the jury's rationale." *Guajardo v. State*, 290 Ga. 172, 174 (2) (718 SE2d 292) (2011). See *McElrath*, 308 Ga. at 111 (2) (c). "Where a jury renders repugnant verdicts, both verdicts must be vacated and a new trial ordered[.]" *McElrath*, 308 Ga. at 111 (2) (c).

Contrary to Wright's argument, the jury's verdicts against Wright and Allan on the attempted murder charges were not repugnant. As indicated above, our Supreme Court has classified a jury's verdicts finding a principal guilty but an accessory not guilty in the same trial as inconsistent verdicts that provide no basis for reversal, see *Lucas*, 264 Ga. at 840 (2), and we, of course, are bound by that precedent. See Ga. Const. of 1983, Art. VI, Sec. VI, Par. VI ("The decisions of the Supreme Court shall

16

bind all other courts as precedents.").[6] In any event, the jury in this case did not use a special verdict form, and the record does not otherwise make transparent the jury's rationale for convicting Wright but acquitting Allan of attempted murder. "[T]his Court cannot determine if the jury's verdict reflected inconsistent factual conclusions, lenity, compromise, or legal error," *Harris v. State*, 310 Ga. App. 460, 462 (713 SE2d 665) (2011), and, as we have emphasized, "this Court will not engage in speculation or unauthorized inquiry regarding the jury's deliberations." (Citation and punctuation omitted.) *Presley v. State*, 358 Ga. App. 277, 283 (2) (855 SE2d 30) (2021). See *Guajardo*, 290 Ga. at 175 (2). Accordingly, we reject Wright's argument that reversal is mandated based on allegedly repugnant verdicts.[7]

---

[6] Given this binding precedent, we need not address whether the category of repugnant verdicts applies only to contradictory verdicts handed down against one defendant or whether it can apply to contradictory verdicts among codefendants.

[7] In arguing that the verdicts were repugnant, Wright relies upon *Jefferies v. State*, 92 Ga. App. 483, 483-484 (2) (88 SE2d 713) (1955). *Jefferies* involved a joint trial where the defendant was found guilty and his co-defendants were found not guilty of carrying out a lottery. See id. Although this Court in *Jefferies* referred to the verdicts as "repugnant" and concluded that they were void on that basis, see id. at 484 (2), "Georgia appellate courts . . . have often conflated . . . [the] categories" of contradictory verdicts, *McElrath*, 308 Ga. at 108 (2), n. 13, and the verdicts in *Jefferies* were simply an example of inconsistent verdicts reached between a defendant and his codefendants who were alleged to have acted in concert. Because the inconsistent verdict rule has since been abolished, see *Milam*, 255 Ga. at 562 (2), including in the context of contradictory verdicts reached between principals and

17

2. Wright contends that the trial court erred in denying her motion for new trial on the general grounds. We disagree.

> Even when the evidence is legally sufficient to sustain a conviction, a trial judge may grant a new trial if the verdict of the jury is "contrary to . . . the principles of justice and equity," OCGA § 5-5-20, or if the verdict is "decidedly and strongly against the weight of the evidence." OCGA § 5-5-21. When properly raised in a timely motion, these grounds for a new trial – commonly known as the "general grounds" – require the trial judge to exercise a broad discretion to sit as a thirteenth juror. In exercising that discretion, the trial judge must consider some of the things that she cannot when assessing the legal sufficiency of the evidence, including any conflicts in the evidence, the credibility of witnesses, and the weight of the evidence.

(Citations and punctuation omitted.) *White v. State*, 293 Ga. 523, 524 (2) (753 SE2d 115) (2013).

In its order, the trial court properly recited the standard under OCGA § 5-5-20 and OCGA § 5-5-21 and declined to grant Wright a new trial. "[T]o the extent [Wright] asks this Court to review the merits of the trial court's exercise of its discretion as the thirteenth juror, we decline to do so; this Court does not sit as an

---

accessories and between coconspirators, see *Thornton*, 298 Ga. at 714-715 (2); *Lucas*, 264 Ga. at 840 (2), Wright's reliance on *Jefferies* is misplaced.

18

arbiter of the general grounds, which are solely within the discretion of the trial court." (Citation and punctuation omitted.) *Wilson v. State*, 302 Ga. 106, 109 (II) (d) (805 SE2d 98) (2017). Wright thus has failed to show a valid basis for reversal.

3. Lastly, Wright contends that the trial court erred in denying her plea in bar because, she argues, there was no basis for tolling the applicable statute of limitation and the limitation period therefore ran before she was indicted. We do not agree.

"In criminal cases, the statute of limitation runs from the time of the criminal act to the time of indictment." (Citation and punctuation omitted.) *Riley v. State*, 305 Ga. 163, 167 (3) (824 SE2d 249) (2019). The State carries the burden of proving that the crime occurred within the statute of limitation, or that a tolling exception to the limitation period applies. Id. In reviewing the trial court's ruling on a plea in bar predicated on the statute of limitation, we apply a de novo standard of review to issues of law, and "we accept the trial court's findings on disputed facts and witness credibility unless they are clearly erroneous, but independently apply the law to the facts." (Citation and punctuation omitted.) *Royal v. State*, 314 Ga. App. 20, 21 (1) (723 SE2d 118) (2012). "A trial court's factual findings are not clearly erroneous if there is any evidence to support them." (Citation and punctuation omitted.) *State v. Campbell*, 358 Ga. App. 389, 392 (2) (855 SE2d 401) (2021).

It is undisputed that the alleged offenses occurred in May 2011, and that the grand jury indicted Wright more than four years later in April 2017. Because the statute of limitation was four years, see OCGA § 17-3-1 (c), Wright made out a prima facie case that the limitation period had run, and thus the focus of our analysis is on whether the State established that a tolling exception applied. See *Riley*, 305 Ga. at 167-168 (3).

In pursuing charges against Wright, the State relied on the "person-unknown" tolling exception as set out in OCGA § 17-3-2 (2).[8] Under that exception, the limitation period is tolled during the time period when "[t]he person committing the crime is unknown or the crime is unknown[.]" OCGA § 17-3-2 (2).

> When does the identity of the perpetrator become "known" to the State in this context? Ultimately, it is when the State becomes aware of facts that give rise to probable cause to arrest that person for the crime. Probable cause exists when the facts known to the State could lead a reasonably prudent person to conclude that there is a "probability" –

---

[8] The State specifically alleged the tolling exception in each count of the indictment. See *Lynch v. State*, 346 Ga. App. 849, 856 (3) (a) (i) (815 SE2d 340) (2018) ("[T]he State may file an indictment after the statute of limitation period for the alleged crime has expired. In such cases, the State must specifically allege in each count of the indictment the applicable tolling provision or exception to the statute of limitation in order to show that the charged offense is not time-barred.").

20

more than mere suspicion, but less than absolute certainty – that the defendant committed the offense. In this context, the State is charged with knowledge of the facts actually known by the victim. Thus, to establish that the person-unknown exception applies, the State must show that the facts within its knowledge – including knowledge imputed from the victim – were not enough to lead a reasonably prudent person to identify the defendant as the perpetrator until a time that, relative to the indictment, was within the limitation period.

(Citations and punctuation omitted.) *State v. McClendon*, 362 Ga. App. 322, 325-326, (868 SE2d 459) (2022). See *Riley*, 305 Ga. at 168-169 (3); *Countryman v. State*, 355 Ga. App. 573, 580-581 (1) (845 SE2d 312) (2020).

After conducting an evidentiary hearing on the matter, the trial court entered its order denying Wright's plea in bar, finding, among other things, that the State proved that it did not become aware of facts sufficient to provide it with probable cause to arrest Wright until at least November 2014, when the oldest daughter first told Lindo about Wright's involvement in the shooting. The trial court noted that while the knowledge of Lindo was imputed to the State, Lindo had no more than a mere suspicion that Wright might possibly be involved in the shooting until the aforementioned date. Consequently, the trial court concluded that the State carried its burden of proving that the four-year limitation period was tolled under OCGA § 17-3-

2 (2) until November 2014, rendering Wright's April 2017 indictment timely. The trial court reiterated its conclusions in its order denying Wright's motion for new trial.

We discern no error by the trial court. There was evidence that the initial police investigation into Lindo's shooting was suspended in May 2012 because the police were unsuccessful in developing any leads, given the lack of any eyewitness identifications of a suspect, the lack of any physical evidence pointing to a suspect, and the lack of any surveillance recordings of the incident. There also was evidence that although Lindo had some suspicions about Wright over the years, he was not conveyed information about her efforts to kill him until at least November 2014, when he first learned from the oldest daughter that Wright was involved in the shooting and had made prior attempts to kill him or have him killed. And while Wright emphasizes that the son testified that he had been composing rap songs that made reference to the attempted killings since 2012 and had been playing them for Lindo, the son also testified that he would mix together topics when composing songs and that Lindo had not "caught on" until 2015 when he heard the song "Saving Dads Life," which set out all of the ways that Wright had tried to harm Lindo.

Imputing Lindo's knowledge to the State, we conclude there was evidence that the State did not become aware of facts sufficient to provide it with probable cause

to arrest Wright for the shooting until November 2014. Accordingly, the trial court committed no error in determining that the State carried its burden of proving that the limitation period was tolled until November 2014 under the "person-unknown" tolling exception as set forth in OCGA § 17-3-2 (2) and that Wright's prosecution thus was not time-barred. See *Riley*, 305 Ga. at 168-169 (3).

*Judgment affirmed. Brown and Hodges, JJ., concur.*